# CHARLESTON.

ROWAN *v.* CHENOWETH *et al.*

Decided March 23, 1901.

1.  **CAUSE OF ACTION—*Limitation—Action.***
    When a cause of action accrues for or against a party, the statute of limitations does not stop because of his death or until he has a personal representative. (p. 290).
2.  **CREDITORS—*Suit Stops Running of Statute.***
    When an administrator or executor sues in equity to convene the creditors of the estate and administer its assets for the benefit of all the creditors, the statute of limitations stops running against their debts at the commencement of the suit for the purposes of that case. (p. 290).
3.  **PRINCIPAL AND AGENT—*Limitations.***
    A deputy sheriff is agent of the sheriff, and the statute of

limitations applies between them as between agent and principal.    (p. 291).

4.  GENERAL AGENCY—*Running of Statute.*
     In case of a general or continuous agency, as distinguished from a special or isolated agency, the statute of limitations runs between the parties to it from its close.   (p. 292).

5.  BOOK ENTRIES—*Evidence—When?*
     An entry in a book made by a party is not admissible as evidence in his behalf, though he is since deceased, but it is admissible against him as an admission.   If, however, the adverse party calls for and introduces such book in evidence, all entries touching the subject are thus made evidence,—the self-serving as well as the self-disserving entries.   (p. 292).

6.  SET OFF—*Limitations of.*
     The statute of limitations runs against a set-off until it is filed.   (p. 293).

7.  NOTE—*Delivery of—Essential.*
     Delivery of a promissory note is indispensable to its efficacy, and, if not delivered in the lifetime of its maker, it cannot be delivered after his death.   But delivery may be actual or constructive.   If it is clear that the maker of the note intended it to be a finished note and binding on him, without further act on his part, it will so operate, though not actually delivered in his lifetime.   (pp. 294, 295).

8.  TRUSTS—*Limitations.*

Appeal from Circuit Court, Randolph County.

Bill by S. A. Rowan against E. E. B. Chenoweth and others. From the decree, George W. Leonard appeals. .

*Reversed.*

L. D. & J. F. STRADER and C. WOOD DAILEY, for appellant.

HARDING & HARDING, GEO. W. LEWIS, and MOLLOHAN, McCLINTIC & MATTHEWS, for appellees.

BRANNON, PRESIDENT:

S. A. Rowan, as administrator of Z. T. Chenoweth, filed a bill in chancery in the circuit court of Randolph County to convene the creditors of Chenoweth, fix their debts, settle his accounts and the personal estate, and sell the lands of Chenoweth to pay debts not reached by the personalty.   The suit began 31st August, 1894.   The case was referred to a commissioner to report the debts against the estate and other matters involved in the suit.

George W. Leonard appeared before the commissioner and filed a demand against Chenoweth's estate, and the estate filed an account of set-offs against him. The commissioner reported a balance against Leonard in favor of the estate, and upon the report the court decreed the sum of three thousand one hundred and thirteen dollars and thirteen cents against Leonard, and he appeals.

Chenoweth was sheriff of Randolph County for the years 1885, 1886, 1887 and 1888, and Leonard his deputy. The claim of Leonard is that he was to receive for his services as deputy half the entire emoluments of the office. The commissioner disallowed the claim of Leonard for half the commissions and other fruits of the office for want of proof of what compensation Leonard was to receive, but charged him with the taxes which went into his hands. Strange to say, there was no written agreement between the parties to specify the arrangement between them in this important business, no bond given by Leonard; still I think that in the absence of such writing, it is fairly and reasonably established that Leonard's claim of half the emoluments is true. Omar Conrad, a deputy sheriff and jailer, says that he knew of no agreement between Chenoweth and Leonard, but was by at times when they were settling, and it was "my understanding from the conversation between Chenoweth and Leonard that they were halvers in the business." Charles Chenoweth, brother of Z. T. Chenoweth, was for a time jailer, and says that though he knew of no agreement, his understanding was that they were partners. He was in constant intercourse with them. It seems he is not merely conjecturing. The widow of Chenoweth assisted her husband in making out elaborate entries in 1892 in a book of her husband of taxes in the various districts and other items, and made entries at his dictation, which book, so far as it concerned taxes in the various districts chargeable to Leonard, and a settlement made between them for the year 1885, and partly for 1886, was made for the purpose of settlement with Leonard, and she says that she does not remember hearing her husband say how Leonard was to be compensated, "though my impression is he was to receive one-half the emoluments of the office." She must have derived this impression from impartment by her husband. She would not have guessed it. But to make this sure she produced from among her husband's papers two receipts given him by Leonard, dated the 21st of February, 1887;

one for payment to Leonard of eighty-seven dollars and fifty cents, "it being one-half of the allowance of the sheriff for 1886," and for thirty-nine dollars and twenty cents, "it being one-half jail rent from Omar Conrad and Charlie Chenoweth, 1885 and 1886." The other receipt is for eight hundred and forty-three dollars and five cents, "it being one-half of the sheriff's commission on State, county, district, schools, and district schools for the year 1885." Now, these are enough to enable us to say that Leonard was to recevie half the emoluments.

But Leonard's rejected claims are barred by limitation, in the absence of evidence of actual collection within five years before the suit. Particular collections shown to have been made within five years could be recovered by either side, and those only. Those items would not save others collected before from the statute. The statute began to run against Leonard in Chenoweth's lifetime, and his death did not stop it, even though he had no representative. *Handy* v. *Smith,* 30 W. Va. 195; *Wilson* v. *Harper,* 25 *Id.* 179; *Mynes* v. *Mynes,* 47 *Id.* 681, (35 S. E.,935). When did the statute stop running against Leonard? By various decisions it ran on until the court made a reference for the benefit of all creditors to ascertain and decree their debts. *Laidley* v. *Kline,* 23 W. Va. 565; *Bank* v. *Hayes,* 37 *Id.* 475. Those cases were suits by individual creditors against estates. Until reference it could not be known that the suit would go on for all; hence the other creditors might till then sue. But we think that when an administrator brings such a suit as this, as the estate's representative, to administer the personal estate and apply it and the realty both for all creditors, it is a guaranty of prosecution to the end; the creditors may demand that it go on, and the statute stops running against creditors at its institution. The Code gives the personal representative power to bring such a suit as the vehicle of relief for all creditors, gives him a right to do so to the exclusion of creditors for six months after the qualification of a representative; and this statute would contemplate the cessation of the statute of limitations at the date of such suit. Code 1899, chapter 86, section 7. When one creditor sues expressly for all creditors the statute stops at date of suit. *Jackson* v. *Hull,* 21 W. Va. 612; *Dunfee* v. *Childs,* 45 *Id.* 155; Hogg's Eq. 618. When did the statute of limitations commence to run against Leonard's demand for commissions on taxes and executions, and for jail rent, county allowances and fees? We cannot

solve this question by saying that Chenoweth and Leonard were partners. There can be no partnership in a sheriffalty. It would be against public policy. We cannot apply the statute as between partners. There may be a deputyship, with services of the deputy to be compensated by a share of the emoluments without its being contrary to law or a partnership. *Davis* v. *Baker,* 45 W. Va. 455. A deputy is simply an agent appointed by the sheriff to perform service for him; it is the relation of principal and agent. *Poling* v. *Maddox,* 41 W. Va. 781; 9 Am. & Eng. Ency. L. (2 Ed.) 369. Hence the statute applies as between man and man, as for money had and received, in this case. We must not regard the relation as one of trust, not subject to the statute. In a sense it is a trust. So is any case where a man entrusts money to another. But it is not that special and peculiar trust cognizable in a court of equity only, where the statute does not apply, for an action of *assumpsit* lies for money had and received or for services between principal and agent. This subject is discussed and this principle held in *Thompson* v. *Iron Co.,* 41 W. Va. 574, 581, and *Wood* v. *Stevenson,* 43 *Id.* 149. "The trusts against which the statute does not run are those technical and continuing trusts not cognizable at law, and falling within the proper, peculiar and exclusive jurisdiction of equity; but such other trusts as may be ground of action at law are subject to the operation of the statute." *Landis* v. *Saxton,* 24 Am. St. R. 403. That was the treasurer of an extinct corporation and the statute was held to begin on the dissolution of the corporation. See *Gapen* v. *Gapen,* 41 W. Va. 427; Hogg's Equity 757.

When does the statute begin to run between principal and agent? That depends on the character of the agency. Where there is an isolated or special agency, one for a particular act or acts, one to collect a specific debt or debts, the statute begins from the act or collection in each particular case; but where the agency has currency, is continuous, is general, involving many acts, or a course of business involving many transactions, the statute begins from the termination of the agency. The contract of agency is, a lump, covering several years, covering many items, and the parties reserve them for settlement some day ahead. You cannot start the statute at date of each collection or each item of liability, innumerable items in an account which both sides treated as open, and there is a necessity to fix some day. 1 Rob. Pr. 488; 1 Wood, Lim. 347, 349 n. 2; Angell, Lim. s. 181 n. 2;

*Hopkins* v. *Hopkins,* 4 Strobh. (S. C.) Eq. 207; *Estes* v. *Stokes,* 2 Rich. (S. C.) 320. The Virginia case of *Riverview Land Company* v. *Dance,* 35 S. E. 720, holds that in continuous agencies the statute begins at their termination; but that if the law gives a right to either to demand payment before, it runs from demand and refusal. No doubt there can be a demand for adjustment giving cause of action at once; but as a general rule, in the absence of special curcumstances, changing it, as there may be, the statute starts at the close of the agency. The books show that the statute applies between principal and agent. Its wise policy to have an end of liability and give peace of mind, happiness of life and to prevent litigation, should be liberally applied, as well to this relation as others. Therefore, Leonard's demands for emoluments of office and store account were barred when the suit began.

How as to Chenoweth's demands against Leonard? The commissioner charged Leonard with taxes put in his hands for collection upon no other evidence than entries made by Chenoweth and his wife under his dictation in a book in 1892. Counsel claim that this is illegal evidence. Though fully discussed by counsel no authority is furnished by either side, on this point, and I have been compelled to seek it. Leonard called for this book, and the commissioner thought that this fact made it evidence not only for, but against Leonard. The reverse is claimed as true. Entries made by Chenoweth against his own interest would be admissions, and admissible against him, because he would not make self-disserving admissions unless true; but his entries against Leonard would be self-serving declarations, made in his own interest, not admissible to Leonard's prejudice. *"Scriptura pro scribente nihil probat,"* is a fixed maxim. "A party's self-serving declarations cannot be put in evidence in his own favor whether he be living or dead at the trial." 2 Whart. Ev. ss. 1100, 1101; 1 Greenl. Ev. (17 Ed.) s. 147; *Vinal* v. *Gilman,* 21 W. Va. 301; see *High* v. *Pancake,* 42 W. Va. 602; *Crothers* v. *Crothers,* 40 W. Va. 169.

The book is not admissible as a book entry made in due course of business, while the business current went, and thus a part of the *res gestae,* as it was made out several years after the business closed, not as an itemization as items in business occurred, but in a lump, as a whole, with a view to settlement as between themselves. 1 Greenl. Ev. ss. 120*a,* 120*b*; 1 Whart. Ev. ss. 681, 683.

Under these principles the book would not be evidence for Chenoweth, if offered by his administrator; but the rule is that when a party calls for the production of and uses a writing or account of his adversary, the whole writing, the whole account, debits and credits, is thus made evidence in the case. It cannot be garbled; one side or showing of it merely cannot be used for hurt of one party to the benefit of another. 1 Greenl. Ev. s. 563; Wharton's Ev. ss. 620, 1103; *Jones* v. *Jones* 4 Hen. & Munf. 447; *Freeland* v. *Cocke,* 3 Munf. 352. So the commissioner did not err in acting on the evidence.

But, as I understand from the report, Leonard relied upon the statute of limitations. Is the demand of Chenoweth's estate barred? There is no written contract, no bond given by Leonard as deputy sheriff. The plaintiff did not make Leonard a party to the case or set up any demand against him until after Leonard filed his account before the commissioner, when, on 1st April, 1896, the administrator filed his account of sets-off. When did right of act accrue? At the close of the term, 31 December, 1888, the close of agency. The statute ran from then until said sets-off were filed. *Hurst* v. *Hite,* 20 W. Va. 183. So says Code, chapter 126, section 9. The suit did not stop the statute as to Chenoweth's demand as the bill did not set up a demand against Leonard and make him a party. *Woodyard* v. *Polsley,* 14 W. Va. 211. So it seems that the charges made by the commissioner and decree against Leonard for taxes in his hands are erroneous because they were barred by limitation. This troublesome subject of limitation is presented by counsel for decision, but not a line of law is cited by counsel on either side upon it. It seems that the court snould have the aid of the research and conclusions of counsel, especially of counsel so well able to give aid as those engaged in this case.

There is another matter calling for decision. Chenoweth's first wife derived from her father's estate about two thousand two hundred dollars. No one disputes this. It is clearly proven by his many declarations and independent evidence. Chenoweth took charge of it only to invest for her, and did invest it, perhaps in his own name, but in fact for her. It is beyond any denial, free from denial, proved that he declared it her separate estate, as it was in law, and said that he was increasing it by ten per cent. interest. He never set up the slightest claim to it. By this first wife Chenoweth had two children, Joseph S. and Willie

V. Chenoweth. This first wife died. There were found among Chenoweth's papers after his death four promissory notes, dated 21 December, 1889, two of them payable to Joseph S. Chenoweth eight and nine years after date, one for one thousand dollars, the other for five hundred dollars, and two like notes payable to Willie Voves Chenoweth, and they were presented before the commissioner and reported as debts against his estate. The administrator contests their validity. It is claimed that they have no force for want of delivery. There can be no valid deed or promissory note without delivery; but a constructive delivery is sufficient. It must be confessed that it is somewhat difficult to hold these notes valid; and yet the plainest justice calls for it, if it can be done at all consistently with law, as I think it can. That a husband may be debtor to the wife for the loan of her separate estate is clear, if intended as a loan, not a gift. *Bank* v. *Atkinson,* 32 W. Va. 210. Here it was not a loan; he took it only to invest. As to the honesty of this transaction, there is no attempt at its impeachment, no whisper. It is fully proven that the wife had this separate estate, and committed it to her husband's hands for investment only; and he always so acknowledged. But the question, the only question, is, are these notes invalid for want of delivery? Chenoweth executed these notes. He must have intended them to have some effect. Why did he not deliver them? Because the payees were mere children under his own roof. Who better or safer than he as the custodian of these notes? he likely, as a man unlearned in law, thought. He intended them to bind him and his estate, as we can with clear confidence say under the evidence. His mother swears that the first wife died 23 June, 1888, and that when Chenoweth informed his mother that he was going to marry again, she asked him, "Are you going to save these children's money for them?" and he replied that he was. After his second marriage the mother says he called her into a room and produced these very notes, read them to his mother, and said he wanted to carry out the request of the mother of these two children, and he wanted her (his own mother) to be satisfied about it. The children were staying with their grandmother and father at the time of the first conversation. Now, these explicit declarations to the grandmother so deeply interested in these children, and who was anxious that justice be secured to them, tell us that Chenoweth intended finally that these notes should bind him, and that he retained

possession only for their safety for his children. The grand-mother after the second marriage was on the eve of going to the far west, and went, and she was shown the notes to satisfy her solicitude. Chenoweth's sister, in his last illness, asked him in what part of his property the money of these children was, and he replied, "In any of, in all of it," and said that his mother knew all about it, that he had shown the notes to her before she went west. The evidence is plenary from his mother, sister and M. D. Smith, the brother of the first wife, that she always claimed, and he always recognized, this money as her separate estate. There is no contradiction of these facts. I say the in-tention of Chenoweth that these notes should bind him was full and final, and that this solves the matter in behalf of justice. In the unsatisfactory, opinionless case of *Hutchinson* v. *Rust,* 2 Grat. 394, it is laid down, so far as anything is inferrable, from it, that when a deed is acknowledged and retained by the grantor, it depends on the intention whether it should be regarded as a final deed, and this may be gathered from evidence of the grantor's previously declared purpose. Chenoweth's declarations to his mother and sister leave no doubt as to his intention. In *Howe* v. *Ould,* 28 Grat. 1, it is held that delivery of a note may be constructive, and that numerous decisions in reference to deeds show the reluctance of courts to permit mere technicalities with respect to delivery "to defeat the intent of the parties and the manifest justice of the case." "It is not necessary that there should be a manual transfer of the note; a constructive delivery is sufficient if made with the intention of transferring title." 4 Am. & Eng. Ency. L. (2 Ed.) 202. "Delivery of a deed de-pends on the intent of parties, and, though not in formal words, may be shown by circumstances." *Ferguson* v. *Bond,* 39 W. Va. 561. I understand *Lang* v. *Smith,* 37 W. Va. 734, to so hold. Nor is *Cann* v. *Cann,* 40 W. Va. 138 *contra.* There was in that case no showing, as here, of any final intent of the maker of the due bill to be bound by it; indeed, it was not regarded as gen-uine. Each case, when it turns on the facts, must stand on its own facts. If these notes had been made payable to strangers, or even adult children, we might demand an actual delivery; but these were children in his own house. To whom could he deliver the notes? They are a trustee's solemn admission in writing of his liability for money put in his hands to hold in trust, not a borrower's obligation. Chenoweth delivered them, in effect, to

the next friend of the children, their grandmother; he delivered them on his dying bed to their aunt for them when he declared their obligatory force on all his estate. We hold the decree right in allowing these notes. Being debts not voluntary, but based on valuable full consideration, of course they were properly allowed *pro rata* with other general debts, and the complaint of Virginia Collet's executor that they were not postponed to other debts is overruled. We reverse the decree and remand the case to be proceeded in as herein indicated; but without prejudice to the right of either George W. Leonard or the adminstrator of Z. T. Chenoweth as to any action at law between them now pending.

*Reversed.*