HELEN G. CASTO, *Executrix, etc.*

*v.*

GEORGE T. MARTIN

(No. 13541)

Decided July 23, 1976.

*DiTrapano, Mitchell, Lawson & Field, Rudolph L. Di-Trapano, Davis & Nesius, John J. Nesius* for appellant.

*Steptoe & Johnson, Edward W. Eardley, Simpson & Baughan, Robert L. Baughan* for appellee.

FLOWERS, JUSTICE:

This action was instituted to recover upon a promissory note for $94,073.48 signed by the defendant, George T. Martin, made payable to the order of Claude C. Casto. Contemporaneously, Castro had endorsed all his corporate stock in McKay Corporation over to Martin for transfer to Donald Carman. The note was never out of the possession of the maker's attorney, it being the defendant Martin's contention that payment was to be made only if he first got paid for the stock by the purchaser, Carman. Carman defaulted and Martin repurchased the stock at a foreclosure sale. Casto died and his widow brought this suit as executrix of his estate.

The case was tried before a jury in the Common Pleas Court of Kanawha County and the trial court entered judgment in favor of the plaintiff upon a jury verdict of $94,073.48, the amount of the note. The judgment was affirmed by the Circuit Court of Kanawha County and

the defendant Martin was granted an appeal to this Court.

The three major questions forming the basis of this appeal are whether the trial court erred (1) in admitting into evidence an unauthenticated and wholly typewritten memorandum purporting to be from the defendant to plaintiff's testator; (2) in failing to direct a verdict in the defendant's favor at the conclusion of plaintiff's evidence and at the conclusion of all the evidence and in refusing to set aside the verdict and judgment because the evidence sufficiently established that the delivery of the note was predicated upon the occurrence of a condition precedent; and (3) in giving Plaintiff's Instruction 4 as amended.

Three commercial events provide the background for the disputed liability upon the note: (A) George T. Martin, the defendant, Claude Casto, the plaintiff's decedent, and two other associates bought controlling interest in the First National Bank of South Charleston; (B) two years later Martin and the same associates sold all their stock to Donald Carman upon a deferred payment arrangement; (C) Carman defaulted in making the second and final payment and a foreclosure sale was held.

Although this case presents a rather complex factual situation, an expanded presentation of the facts as they relate to these three events reveals but little dispute about what transpired.

A

Warden Allen, who owned 42% of the stock of the First National Bank of South Charleston, died on June 16, 1967. Since an additional 10% of the bank stock was owned by other members of his family, collectively the Allen family held the controlling interest in the bank.

After the death of Warden Allen who had served as president of the bank until his death, there was apparently divided sentiment about whether the stock should be sold to George T. Martin or to Claude C. Casto. Casto

for a number of years had served as vice-president of the bank. When Casto could not secure the funds to buy the stock, it was offered to Martin.

Martin, who was not experienced in the banking business, invited Casto to participate with him in the purchase. Casto was permitted to include two other bank employees in the venture. Using Martin's credit and cash to bind the deal, the four associates formed a bank holding company called "McKay Corporation." The McKay Corporation issued stock and accepted the subscribers' promissory notes in full payment therefor as follows:

| Name | Shares | Note Amount |
|------|--------|-------------|
| George T. Martin | 250 | $250,000 |
| Claude C. Casto | 100 | 100,000 |
| Garth E. Thomas | 50 | 50,000 |
| Lovell Myers | 30 | 30,000 |

McKay Corporation then borrowed $719,900, the full purchase price of the South Charleston bank stock, from The Charleston National Bank, pledging the 6,260 shares purchased from the Allens as collateral.

Martin agreed that the salaries of Casto, Thomas and Myers at the First National Bank would be increased sufficiently to retire their notes and thus pay for their McKay stock over a ten-year period. The approximate annual salary increases were, respectively, Casto $11,000; Thomas $5,500; and Myers $3,500. The parties, to insure the financial stability of McKay, contributed $10,000 to the corporation as "seed money" in the same ratio as their stock holdings. When McKay Corporation income from its bank dividends became insufficient to keep The Charleston National Bank loan current, Martin bought an additional 290 shares of McKay stock at the original price.

In unrelated transactions, George Martin, individually, had purchased other shares of First National stock. About 18 months after the Allen sale to McKay Corpora-

tion, Martin and Casto jointly purchased a block of 2,800 shares in the same bank.

## B

Sometime in 1969, Martin was approached by Donald Carman who expressed an interest in purchasing controlling interest in the South Charleston bank. By this time various stock splits had apparently inflated the number of shares of stock outstanding. McKay Corporation held 20,866 shares and Martin individually owned 13,699 shares. Martin advised that he would only sell if Carman would purchase the stock of his associates at the same unit price. After some negotiation and discussion principally between Carman and Martin, Carman and Martin executed an agreement dated August 4, 1969, by which:

1. Martin sold Carman 3000 shares of bank stock at a price of $65.00 per share.

2. For the sum of $55,000 Martin granted an option to Carman

   a. to purchase all 720 shares of McKay Corporation or its 20,866 shares of bank stock for $1,356,290 (which would be $65.00 per bank share);

   b. to purchase Martin's remaining 10,699 individually held bank shares for $695,435 (which equals $65.00 per share);

   c. to purchase Martin's controlling interest in Wheeling Coca-Cola Bottling Co. for $733,000;

   d. to purchase Martin's controlling interest in McNicol-Martin, a Clarksburg china company, for $195,000.

The total purchase price for the optioned items was $2,979,725, subject to certain adjustments plus credit for the $55,000 option price. The option was exercisable by payment of the balance on February 4, 1970, or on August 4, 1970, with an 8% increase in the gross price. Apparently sometime after the date of the document,

August 4, 1969, Martin and Carman treated the option as an agreement of sale of the various business entities and Carman gave his note, payable on the respective exercise dates, to Martin at The Charleston National Bank.

In a separate transaction on October 15, 1969, Martin and Casto sold to Carman the shares of bank stock which they held jointly. The unit price of the shares appears to be the same $65.00 rate and this sale, which was apparently for cash, yielded each a profit of $35,000.

On October 17, 1969, events crucial to the present dispute took place. Each stockholder of McKay endorsed his shares over to George Martin. New stock certificates of McKay, representing the shares of surrendered stock, including those formerly held by Martin, were issued to Carman. On the same date, Martin had McKay Corp. return the promissory note of each stockholder with the balance of the indebtedness thereon cancelled. Martin further sent the other three McKay stockholders his check for a sum slightly in excess of what each had paid on the McKay stock by means of increased salaries at the bank. Lastly, and to the point of dispute here, Martin executed a promissory note payable to the order of each of his other three associates. The Martin notes were payable for an amount which represented the sale price to Carman at $65.00 per share, less the balance each owed the McKay Corporation for his stock and less the amount of Martin's cash remittance. The payment dates of the notes and price adjustments thereon were identical to the dates and adjustment amounts of the Carman option dated August 4, 1969, and, apparently, the Carman note to Martin. Essentially the notes appeared to be in a sum which approximated the expected profit to be realized when the purchaser, Carman, consummated the sale by paying the balance of the sale price. The notes never left the possession of Martin's attorney, Robert H. C. Kay, until he was compelled to surrender them at the trial.

## C

Carman and his assignee, the Two Corporation, defaulted on the final payment date August 4, 1970, and on August 28, 1970, Martin purchased the transferred shares at a foreclosure sale. Carman's management of McKay Corporation and the First National Bank of South Charleston was terminated and it reverted to Martin. The former associates informally extended the time until December of 1970 for Carman to consummate the sale and on October 4, 1970, Claude Casto died.

There is some evidence that prior to Casto's death, the three associates, who were bank employees, rejected the opportunity to resume their proportionate ownership positions with Martin by executing new notes and returning the cash they had received. If they chose not to reinvest, however, they were assured that their salaries would not be reduced to the amounts they were earning prior to their venture with Martin.

## I

The initial question presented for decision is whether an unsigned and wholly typewritten memorandum purportedly from Martin to Casto was properly admitted in evidence. The memorandum was as follows:

### "MEMORANDUM

October 27, 1969

TO: CLAUDE C. CASTO

FROM: George T. Martin

The sale of your stock to the McKay Corporation, 100 shares, made you a profit of $91,    .00.

After giving you credit for your investment and the money you paid on your note, the balance due on your note is $87,794.59, leaving a net due you of $103,377.41.

My check for $12,922.18 and my note for $90,455.27 make up this total settlement. Your original note for $100,000.00 and my check are attached hereto.

The sale is based on an installment sale basis of one-eighth of your profit on the sale of $191,172.00, less your cost of $100,000.00, which is your taxable income. One-eighth of this is taxable for the year 1969 and the other seven-eighths will be taxable for the year 1970, when the note is paid."

The memorandum was admitted through the testimony of Castro's accountant who revealed that the document was delivered to him, together with an unsigned copy of the note, by Casto in order to determine whether the stock transfer qualified for capital gains treatment. When Martin later took the stand he was not asked to identify or verify the genuineness of the document, but neither did he repudiate it.

A party seeking to introduce a private writing must offer competent proof showing its authenticity or genuineness. Instruments of this kind do not prove themselves.[1] The authenticity sought to be established is that the writing was written and sent by the party whose name it bears.[2]

The authenticity of a letter may be established in more than one way.[3] It may be established directly by proof of handwriting or by indirect or circumstantial evidence.[4] The contents of a writing may be critical in establishing admissibility. When the contents of a letter are of such nature that the letter could not have passed between any parties except the purported writer and the person to whom it was delivered, the letter is admis-

---

[1]*Maynard v. Bailey*, 85 W. Va. 679, 102 S.E. 480 (1920); *Cobb v. Glenn Boom & Lumber Co.*, 57 W. Va. 49, 49 S.E. 1005 (1905); *Nat'l Bank v. Nat'l Bank*, 7 W. Va. 544 (1874); 29 Am. Jur. 2d *Evidence* §§849, 879 pp. 948-49, 981; 3 S. Gard, Jones on Evidence, §17:1, 17:17 pp. 239-40, 274 (6th ed. 1972).

[2]*Nat'l Bank v. Nat'l Bank, supra;* 29 Am. Jur. 2d *Evidence* §849, p. 949.

[3]*State v. Huffman*, 141 W. Va. 55, 87 S.E.2d 541 (1955); *Maynard v. Bailey, supra.*

[4]*Maynard v. Bailey, supra; State v. Huffman, supra.*

sible.[5] In *United States v. Sutton,* 426 F.2d 1202 (D.C. Cir. 1969), the court found that in some special circumstances where the contents reveal a knowledge or other trait peculiarly referable to only one person, the contents alone may be sufficient to prove genuineness.

Admittedly the memorandum received into evidence in the instant case was unsigned and wholly typewritten; its contents, however, disclosed details of a complicated financial transaction which could only have been known by Martin. It was delivered by Casto to his accountant in connection with related tax consequences and treatment. Martin, the purported author, failed to deny or discredit in any way the authenticity of the memorandum.

Authenticity is a question resting within the sound discretion of the trial court. In *State v. Huffman,*[6] the court stated:

"Whether the authenticity of a letter is sufficiently established to render it admissible in evidence is a matter largely within the discretion of the trial court." Syllabus Point 9.

"The action of a trial court in admitting or excluding evidence in the exercise of its discretion will not be disturbed by the appellate court unless it appears that such action amounts to an abuse of discretion." Syllabus Point 10.

Since the contents of the writing provided a sufficient basis for admissibility, we find no compelling reason to conclude that the trial court abused its discretion in admitting this unsigned memorandum into evidence.

II

The defendant also contends that the trial court should have directed a verdict either (a) at the close of the plaintiff's evidence or (b) at the conclusion of all the

[5]*Ibid.*
[6]*Supra* note 3.

evidence or in alternative (c) set aside the verdict and judgment.

The defendant waived error on his motion for a directed verdict at the close of the plaintiff's case by the presentation of evidence.[7]

The basis of the other two errors is the defendant's contention that he was not obligated on the note as a matter of law (1) because there had been no actual or constructive delivery; and, (2) because liability for payment accrued only upon the occurrence of the oral condition that the Carman deal be "consummated", an event which never occurred.

The original note executed by Martin to Casto for $94,073.48 was introduced into evidence, over the objection of the defendant, through the testimony of Martin's attorney, Robert H. C. Kay. Mr. Kay testified that he had been in possession of the note since it was signed by his client, Martin, and that he had not delivered the note and was not to deliver the note until the Carman deal was consummated.

He stated:

> "It was not delivered, because I had no power to deliver it. It was to be delivered on the consummation of the deal. It was not consummated, and I had no power to, and did not deliver it."

In support of the plaintiff's position that the note was not predicated on any oral contingency that Carman consummate the transaction by payment of his obligation to Martin, the plaintiff introduced into evidence the memorandum previously set forth and a letter written by Kay at Martin's direction almost two months later. That letter, on the stationery of Kay's law firm, reads as follows:

---

[7]Lugar and Silverstein, *West Virginia Rules* 376.

"December 15, 1969

Mr. Claude C. Casto
The First National Bank
  of South Charleston
South Charleston, West Virginia

Dear Claude:

I have in my possession and hold the notes described as follows:

| Name of Payee | Name of Maker | Date of Note | Amount |
|---|---|---|---|
| Claude C. Casto | George T. Martin | Oct. 17, 1969 | $94,073.48 |
| Garth E. Thomas | George T. Martin | Oct. 17, 1969 | 46,141.20 |
| Lovell R. Myers | George T. Martin | Oct. 17, 1969 | 27,707.90 |

The foregoing notes are to remain in my possession until the transactions of Donald C. Carman, The Charleston National Bank and George T. Martin are consummated, and at that time they will be turned over to The Charleston National Bank who, in turn, will pay direct to the foregoing payees the amount due them according to the terms of said notes.

Yours very truly,
/s/ Robert H. C. Kay
Robert H. C. Kay"

Claude Casto's accountant testified that cash received by Casto from Martin was treated as capital gains on Casto's 1969 tax returns and no tax measures were taken with regard to the $94,000 note.

Thomas testified that he received a $6,000 check from Martin and his $50,000 note was cancelled. He stated that he was to receive an additional $40,000 "[i]f the Carman people paid their note" and that the note by Martin payable in that amount was to be held by Robert

Kay until such time as Carman paid off his note to Martin.

On rebuttal, Lovell Myers testified that he received $3,800 from Martin in connection with the Carman deal and at a later time a copy of a promissory note made payable to him by Martin.

Myers testified:

> "Q. At the time you signed your stock certificate over, did you have any knowledge or information there was anything contingent about your being paid on that note?
>
> "A. No, sir."

Myers admitted on cross-examination that his original note given in payment for the stock had been cancelled and that when he met with Carman it was explained "perhaps in words" that when Carman paid his note he would receive the rest of the money. On redirect Myers stated he had no reason to believe Carman would not pay his note.

The plaintiff contends the jury was entitled to weigh the documentary evidence of an unconditional promise by Martin to pay Casto against the testimony of a conditional promise and that their verdict should be accorded respect by this Court.

The undisputed evidence reflects that from the time of execution until the time of trial the notes were in possession of the defendant's attorney. The general rule is that a promissory note is of no effect without a delivery. A constructive delivery, however, may be sufficient. *Rowan v. Chenoweth*, 49 W. Va. 287, 38 S.E. 544 (1901). In the seventh point of the syllabus of *Rowan* the Court stated:

> "Delivery of a promissory note is indispensable to its efficacy, . . . . But delivery may be actual or constructive. If it is clear that the maker of the note intended it to be a finished note and binding on him, without further act on his part, it will so

operate, though not actually delivered in his lifetime."[8]

The burden is upon the plaintiff to establish delivery by a preponderance of the evidence and the question is ordinarily one of fact for the jury.[9]

The note was never delivered to Casto; it was delivered by the defendant maker to the maker's agent. The narrow issue is whether the defendant's acts are sufficient to constitute a constructive delivery.

In *Bennett v. Neff*, 130 W. Va. 121, 42 S.E.2d 793 (1947), the Court held intention of the parties to be the essential and controlling element of delivery. Delivery to a third person with a concurrent intention to relinquish all dominion has been held sufficient.[10]

The defendant contends that the delivery in the instant case was not constructive but conditional. We agree that it was not "constructive". We doubt that it was conditional.

In 11 Am. Jur. 2d *Bills and Notes* §279, the following rule is recognized:

> "Delivery of an instrument may be conditional and, as between immediate parties and as regards a remote party other than a holder in due course, such fact may be shown even though the condition is an oral one, if it is a condition precedent. Violation or nonperformance of a condition precedent renders the instrument void and wholly unenforceable as to such parties."[11]

---

[8]*Howe, Know & Co. v. Ould & Carrington*, 28 Grat (69 Va.) 1 (1876); *Bennett v. Neff*, 130 W. Va. 121, 42 S.E.2d 793 (1947); *Downs v. Downs*, 89 W. Va. 155, 108 S.E. 875 (1921); *See Furgurson v. Bond*, 39 W. Va. 561, 20 S.E. 591 (1894).

[9]*In Re Smith's Estate*, 244 Iowa 643, 56 N.W.2d 477 (1953); *Downs v. Downs, supra*; 11 Am. Jur. 2d Bills and Notes §276, p. 302.

[10]*Davis v. Ellis*, 39 W. Va. 226, 19 S.E. 399 (1894); 11 Am. Jur. 2d *Bills and Notes* §278, pp. 303-304.

[11]*See*, 10 C.J.S. *Bills and Notes* §79, pp. 515-16.

This Court recognized in *Weirton Savings and Loan Co. v. Cortez,* 157 W. Va. 691, 203 S.E.2d 468 (1974) that a party may, without violation of the parol evidence rule, establish an oral condition precedent which would show the nonexistance or contingent efficacy of the contract (promissory note). Likewise in *Bennett v. Neff, supra,* delivery to a third person was held ineffectual when that delivery was predicated upon a condition which did not occur.

The evidence clearly reflects that the maker's agent prepared the note at the maker's direction and that it never left the agent's possession. There was no intention by the maker to part with all dominion and control. The defendant maker intended to incur liability on the note only when the obligations to him had been met by Carman.

The testimony of the attorney-agent, the defendant, one of the former owners of McKay stock, and the letter to Casto from attorney Kay are consistent with this conclusion. The only evidence which supports the plaintiff's theory of constructive delivery is the Martin memorandum and the rather equivocating testimony of Lovell Myers.

The contents of the memorandum merely disclosed the details of the financial consequences of the stock sale. At best it is indicative of the defendant's belief that the sale of the stock had been successfully negotiated. It cannot, however, be reasonably construed as evidence of the defendant's intention to incur liability upon a note irrespective of the successful completion of the stock sale. The face of the Martin-Casto note reflects that the payment dates were coincident with the payment dates of the Carman-Martin notes. We do not find support for plaintiff's theory in the testimony of Lovell Myers. He admits that "in words" he was told that any profit accruing to him from the sale would be paid when Carman paid his note to Martin.

We find, therefore, that the trial court erred in failing to direct a verdict for the defendant at the conclusion of

all the evidence. Reviewing the evidence in the light most favorable to the plaintiff, we find no basis for permitting recovery.[12] Construed in this light the evidence reflected a "delivery" to Attorney Kay conditioned upon the occurrence of an event which did not take place. We doubt that the circumstances surrounding the preparation and execution of this note and its retention by the maker's agent could be construed to constitute any delivery at all. Where delivery is to a third person who is the agent of the maker, the act is not a sufficient constructive delivery, the theory being that agency is revocable at any time until a delivery is actually made.[13] Where the evidence given on behalf of the plaintiff is clearly insufficient to support a verdict for him so that such verdict, if returned by a jury, must be set aside, and the evidence of the defendant is clear and convincing, it is the duty of the trial court, when so requested, to direct a verdict for the defendant. *Jones, Inc. v. W. A. Wiedebusch Plumbing & Heating Co.*, 157 W. Va. 257, 201 S.E.2d 248 (1973).

## III

The final issue involves the giving, as amended, of Plaintiff's Instruction No. 4. While resolution of any issues involving instructions is not necessary to a decision of this case since we are compelled to reverse for failure of the trial court to direct a verdict, counsel has assigned this ground as a major error in the trial.

The Instruction provided:

"The Court instructs the jury that delivery of a note may be constructive as well as actual. It is not necessary that there be an actual manual

---

[12]*Reese v. Lowry*, 140 W. Va. 772, 86 S.E.2d 381 (1955); *Frampton v. Consolidated Bus Lines, Inc.*, 134 W. Va. 815, 62 S.E.2d 126 (1950); *Fielder v. Service Cab Co.*, 122 W. Va. 522, 11 S.E.2d 115 (1940); *Burgess v. Sanitary Meat Market*, 121 W. Va. 605, 5 S.E.2d 785, 6 S.E.2d 254 (1939).

[13]*Rex Smith Propane, Inc. v. Nat'l Bank of Commerce*, 372 F. Supp. 499 (N.D. Tex. 1974); *City Nat'l Bank v. Morrissey*, 97 Conn. 480, 117 A. 493 (1922); 11 Am. Jur. 2d *Bills and Notes* §278, pp. 303-04.

transfer of the note from the maker to the payee if the maker evinced an intention to make it an enforceable obligation against himself, according to its terms, by surrendering control over it and intentionally placing it under the power of the payee or of some third person for his use.

"Therefore, if you believe from a preponderance of the evidence that George T. Martin executed the note in question payable to Claude C. Casto and that Martin delivered said note to Robert Kay with the intention that Mr. Kay *either* deliver the note to the Charleston National Bank upon the consummation of the Carman-Martin transaction *or deliver said note to Claude C. Casto in the event the Carman-Martin transaction is not consummated,* then a *constructive delivery* has occurred and you may find for the plaintiff against the defendant in the amount of Ninety Four Thousand Seventy Three Dollars and forty eight cents ($94,073.48), the face amount of the note at maturity, plus four percent per annum on the face amount until payment." (Emphasis added.)

The defendant contends that the instruction (1) did not properly state the law; (2) was not supported by the evidence; and (3) was misleading and in conflict with another instruction. The sole objection made to the instruction at the time it was considered, however, was that it was not supported by the evidence. The rule applicable in this instance has been applied repeatedly and is stated:

"The general rule is that no party may assign as error the giving of or the refusal to give an instruction unless he objects thereto before the arguments to the jury are begun, stating distinctly the matter to which he objects and the grounds of his objections and ordinarily this Court, in the exercise of its appellate jurisdiction, will consider only objections which have been made in this manner. * * * "Syllabus Point 4, *Ellison v. Wood & Bush Co.*, 153 W. Va. 506, 170 S.E.2d 321 (1969)."

Rule 51 of the Rules of Civil Procedure does expressly provide that this Court, "in the interest of justice, [may] notice plain error ... whether or not it has been made the subject of objection."

It is not necessary to note plain error in this case. Counsel objected to the instruction on the basis that it was not supported by the evidence and it was not. There was a total lack of evidence offered by plaintiff to support any instruction on constructive delivery.

The instruction required the jury to find there was a constructive delivery if it concluded that Martin intended a later delivery of the note by Kay upon the occurrence of either of two events: the consummation of the deal or its failure. One or the other was bound to take place, hence, the jury was effectively compelled to find there was a constructive delivery if it believed there was a conditional delivery. The two are not the same. A conclusion was thus invited which was unsupported by the law or by the evidence. There is no evidence even tending to show that Kay had possession of the notes other than as agent for the maker, Martin, and the record is devoid of any evidence from which it could be inferred that Kay was to deliver the note to Casto if the Carman transaction was not consummated. If Carman honored his note held by The Charleston National Bank, Kay was authorized to deliver the notes to the bank for payment from the Carman funds. Possession under these circumstances is probably not a conditional delivery to Kay. It is actually no "delivery" at all. Hence, the jury could not be authorized to infer a constructive delivery by making an unwarranted legal interpretation of Kay's possession as "conditional."

For reasons stated in this opinion, the judgment of the Circuit Court of Kanawha County is reversed, the verdict is set aside, and the case is remanded to the Circuit Court of Kanawha County with directions to enter judgment for the defendant.

*Reversed.*