# STATE OF WEST VIRGINIA
# SUPREME COURT OF APPEALS

**State of West Virginia,**
**Plaintiff Below, Respondent**

**vs)  No. 16-0557** (Lewis County 15-F-120)

**Kevin Lane Putnam,**
**Defendant Below, Petitioner**

**FILED**

**April 7, 2017**

RORY L. PERRY II, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

## MEMORANDUM DECISION

Petitioner Kevin Lane Putnam, by counsel James E. Hawkins, Jr. and Bryan S. Hinkle, appeals his conviction of voluntary manslaughter following a jury trial. Respondent State of West Virginia, by counsel Julie A. Warren, filed a response.

The Court has considered the parties' briefs and the record on appeal. The facts and legal arguments are adequately presented, and the decisional process would not be significantly aided by oral argument. Upon consideration of the standard of review, the briefs, and the record presented, the Court finds no substantial question of law and no prejudicial error. For these reasons, a memorandum decision affirming the order of the circuit court is appropriate under Rule 21 of the Rules of Appellate Procedure.

Shortly after midnight on February 10, 2015, an ambulance and law enforcement officers arrived at the Lewis County home of Steve and Beverly Putnam in response to a 911 call. There, the officers found two of the Putnam's three sons—Steven Jerod Putnam, who had been shot in the chest, and petitioner, who told the officers his brother Steven arrived at the house with the gunshot wound. Steven (the "victim") was taken to the hospital and pronounced dead. Petitioner was taken to a police station and interviewed by Corporal Michael Clark. While these events were taking place, Steve and Beverly Putnam were driving home from Florida.

Back at the Putnam's house, the officers searched the victim's unlocked car, which was sitting outside the house. Despite petitioner's claim that the victim arrived at the house with a gunshot wound, the officers found no trace of blood in the car. However, they did find an unloaded 9 mm revolver and an open bottle of beer. In the house, the officers found a .22 caliber bullet in a wall and a fired cartridge for a .22 caliber bullet. The officers also retrieved several firearms from Mr. and Mrs. Putnam's bedroom, including a .22-250 caliber rifle.

On August 25, 2015, petitioner was indicted for the first-degree murder of the victim. Petitioner's trial commenced on February 16, 2016. During its case-in-chief, the State called the following witnesses:

1

Dr. Joseph Deltondo, who performed an autopsy on the victim, testified that the victim died from "perforations to the heart and lung, due to a gunshot wound to the chest"; that "the manner of death [was] homicide"; that a .22 caliber bullet was removed from the victim's body; that the victim had blunt force trauma to his forehead, nose and mouth area, and minor trauma on his left index and ring finger; and that the victim had a blood alcohol level of .15 to .18, which could have impacted his inhibitions and hand-eye coordination.

Sergeant Judd Holcomb, one of the officers who arrived at the scene on February 10, 2015, testified about the layout of the house, the position of the victim's body, the firearms found in the house, and the items found in the victim's car. Sgt. Holcomb described the scene at the house as lacking any "indicat[ion] that there was any type of massive altercation . . . there was nothing out of place, there was nothing turned over," there was no "blood anywhere[.]" Sgt. Holcomb also testified that, at the scene, petitioner claimed the victim arrived at the house with a gunshot wound to his chest.

Corporal Michael Clark, who took petitioner's recorded statement at the police station soon after the shooting, testified as follows: At the outset of his statement, petitioner again claimed that the victim arrived at the house with a gunshot wound; however, petitioner later admitted he was in a confrontation with the victim during which he shot the victim. Petitioner also claimed that the victim did not want petitioner staying at their parents' house; the victim was the aggressor and had chased him through the house even though petitioner begged him not to; that he just wanted the victim to "stop beating on him"; that the victim "was coming at me and I just lose [sic] it"; that he retreated to his parents' bedroom, grabbed a long gun, and fired two shots at the victim who was six to eight feet away; that he "didn't know you could kill somebody with a .22"; and that he was not afraid of the victim.

Jason Putnam, petitioner's remaining brother, testified that, on the afternoon before the shooting, the victim told him that petitioner was at their parents' house but should not be there; that the victim was thinking about going to their parents' house and said, "I wonder if I went and broke both [petitioner's] legs, if [petitioner] would—laid up in the hospital, that [petitioner] would be dried out and straighten up"; and that there was a .22 rifle in his parents' home that "had been loaded for years, with a clip in it."

Beverly Putnam, petitioner and the victim's mother, testified that, two weeks prior to the shooting, she told petitioner to "stay away" from her house because "he was terrorizing us"; that before she left for Florida, petitioner told her that "if [she] sent [the victim] after him again, he [petitioner] was going to kill [the victim]"; that she spoke with the victim on the phone a few hours before the shooting during which the victim offered to get petitioner "out of the house." Mrs. Putnam testified that she replied, "no" and "[i]f he's not bothering anybody right now, just let him stay there and let him be, don't bother him."

Susan Whitehair, petitioner's girlfriend, testified that she arrived at Mr. and Mrs. Putnam's house around 11:00 p.m. on February 9, 2015; that, about midnight, the victim "just walked into" the house and told petitioner to leave; that an altercation ensued between petitioner and the victim, during which the victim was on top of petitioner, they were hitting each other, and petitioner was saying "stop this"; that the victim was the aggressor; that she ran to the

2

bathroom to retrieve her keys and, on leaving the bathroom, saw the victim standing by the front door holding a gun; that petitioner ran down the hall toward his parents' bedroom; that as she ran back into the bathroom, she heard petitioner say he did not "want to fight anymore" and "don't come back here"; that she started screaming and heard a pop; that three or more minutes later, she emerged from the bathroom and saw the victim on the floor with a gunshot wound; that she attempted to render aid and called 911, but handed the phone to petitioner so she could continue to render aid to the victim; and that she left the residence before the ambulance and the police arrived.

The State then rested. Petitioner moved for a judgment of acquittal, but the circuit court denied that motion. Thereafter, the defense rested without calling any witnesses. Following jury instructions and closing arguments, the jury retired to deliberate. Two hours into their deliberations, the jury presented the following question to the court: "What constitutes the difference between Voluntary and Involuntary Manslaughter?" In response, the circuit court repeated Instruction No. 1 that defined voluntary and involuntary manslaughter, as well as first-degree and second-degree murder. About six hours into their deliberations, the jury advised the bailiff that they were unable to reach a verdict. Over petitioner's objection, the circuit court gave the jury an *Allen* charge[1] and the jury resumed deliberations. About an hour later, the jury asked for a written copy of the instruction listing the elements of voluntary and involuntary manslaughter. The circuit court agreed to give the jury a copy of Instruction No. 1; however, petitioner objected to the jury receiving Instruction No. 1 without also receiving a copy of Instruction No. 15, which provided as follows:

> [I]f you have reasonable doubt as to the grade of the offense of which [petitioner] may be guilty, you shall resolve that doubt in his favor and find him guilty of the lower grade of offense. If you have reasonable doubt as to whether he is guilty of any offense, you must resolve the doubt in his favor and find him not guilty.

The circuit court denied petitioner's request on the ground that the jury did not ask for a copy of Instruction No. 15. Thereafter, the jury found petitioner guilty of voluntary manslaughter.

Post-trial, petitioner filed a motion for a judgment of acquittal and a motion for a new trial; the circuit court denied both by order entered April 19, 2016. By order entered May 17, 2016, the circuit court sentenced petitioner to fifteen years in prison. Petitioner now appeals his conviction.

Petitioner raises four assignments of error on appeal. Petitioner first argues that the circuit court erred in denying his motion for a judgment of acquittal where the State failed to introduce proof beyond a reasonable doubt to defeat his self-defense claim.

The Court reviews such claims under the following standard:

---

[1] *See Allen v. U.S.*, 164 U.S. 492 (1896). "An *Allen* charge is a 'supplemental instruction given to encourage deadlocked juries to reach an agreement.' F. Cleckley, 2 *Handbook on West Virginia Criminal Procedure*, at 257 (1993)." *State v. Shabazz*, 206 W.Va. 555, 559, 526 S.E.2d 521, 525 (1999).

3

A criminal defendant challenging the sufficiency of the evidence to support a conviction takes on a heavy burden. An appellate court must review all the evidence, whether direct or circumstantial, in the light most favorable to the prosecution and must credit all inferences and credibility assessments that the jury might have drawn in favor of the prosecution. The evidence need not be inconsistent with every conclusion save that of guilt so long as the jury can find guilt beyond a reasonable doubt. Credibility determinations are for a jury and not an appellate court. Finally, a jury verdict should be set aside only when the record contains no evidence, regardless of how it is weighed, from which the jury could find guilt beyond a reasonable doubt. To the extent that our prior cases are inconsistent, they are expressly overruled.

Syl. Pt. 3, *State v. Guthrie*, 194 W.Va. 657, 663, 461 S.E.2d 163, 169 (1995).

Based on our thorough review of the record on appeal, we concur with the circuit court's finding that the evidence at petitioner's trial was sufficient to support petitioner's voluntary manslaughter conviction. The evidence at trial supporting the jury verdict of voluntary manslaughter includes the following: First, during petitioner's recorded statement to the police, he admitted that he had gone to his parents' bedroom, grabbed a long gun, fired two shots at the victim, and killed him. He also clearly stated that he was not afraid of the victim, that the victim "was coming at me and I just lose [sic] it[,]" and that he "didn't know you could kill somebody with a .22." Second, petitioner lied to the investigating officers when he said the victim arrived at the house with the gunshot wound. Third, the .22 rifle used to shoot the victim was never found, indicating that the weapon was disposed of before the police searched the house. Fourth, as for Ms. Whitehair's claim that the victim was the aggressor, petitioner had no apparent injuries; however, the evidence at trial revealed that the victim had "blunt force trauma" to his face. Fifth, as for Ms. Whitehair's claim that she saw the victim holding a gun, petitioner did not tell the police that the victim was armed. Sixth, the jury may have questioned the credibility of Ms. Whitehair's testimony given that she was petitioner's girlfriend and fled the scene before first responders arrived. Viewing this evidence in the light most favorable to the prosecution and crediting all inferences and credibility assessments that the jury might have drawn in favor of the prosecution, we conclude that the circuit court did not err by denying petitioner's motion for a judgment of acquittal.

Petitioner next argues that the circuit court erred in denying his motion to give the jury a written copy of Instruction No. 15, along with the written copy of Instruction No. 1. Petitioner alleges that, in failing to provide the jury both instructions, the circuit court failed to focus the jury's attention on the essential issues of the case and to inform it of the permissible way in which those issues might be resolved.

We have oft said that,

A trial court's instructions to the jury must be a correct statement of the law and supported by the evidence. Jury instructions are reviewed by determining whether the charge, reviewed as a whole, sufficiently instructed the jury so they understood the issues involved and were not mislead by the law. A jury

4

instruction cannot be dissected on appeal; instead, the entire instruction is looked at when determining its accuracy. A trial court, therefore, has broad discretion in formulating its charge to the jury, so long as the charge accurately reflects the law. Deference is given to a trial courts discretion concerning the specific wording of the instruction, and the precise extent and character of any specific instruction will be reviewed only for an abuse of discretion.

Syl. Pt. 4, *Guthrie*, 194 W.Va. at 663–64, 461 S.E.2d at 169–70. We also note that Rule 30 of the West Virginia Rules of Criminal Procedure gives a trial court discretion regarding the provision of written instructions to a jury. *See also State v. Lutz*, 183 W.Va. 234, 235, 395 S.E.2d 478, 479 (1988) (trial court has discretion to send written copy of jury charge to the jury).

Here, the jury asked for and the circuit court provided a written copy of the elements of voluntary and involuntary manslaughter, which were contained in Instruction No. 1. However, the jurors did not ask for additional instructions on how to apply the elements of voluntary and involuntary manslaughter to the facts of the case, nor did their request imply the need for such an instruction. Therefore, because the circuit court's response to the jury's request constituted a proper exercise of its broad discretion, we find that the circuit court did not err in denying petitioner's request to send Instruction No. 15 to the jury along with Instruction No. 1.

Petitioner's third assignment of error is that the circuit court erred in denying petitioner's request to give his self-defense instructions, Nos. 20 and 24, to the jury. Proposed Instruction 20 provided that, "The lawful occupant of a home who is subject to an unlawful intrusion and placed in immediate danger of serious bodily harm or death has no duty to retreat but may remain in place and employ deadly force to defend himself." Proposed Instruction No. 24 provided that,

[t]he occupant of a dwelling is not limited in using deadly force against an unlawful intruder to that situation where the occupant is threatened with serious bodily injury or death, but he may use deadly force if the unlawful intruder threatens imminent physical violence or the commission of a felony and the occupant reasonably believed deadly force is necessary.

Petitioner maintains that his mother's testimony proved that he was a "lawful occupant" in his parents' house, and that the victim was an "unlawful intruder" because she told the victim not to go the house and to leave petitioner alone. Petitioner argues that, in light of this testimony, the circuit court erroneously found that the victim "had as much right to be [at his parents' house] as his brother did."

The circuit court did not abuse its discretion in refusing to give petitioner's Instructions Nos. 20 and 24 to the jury because the evidence presented at trial, viewed in the light most favorable to the State, did not support a finding that petitioner was a "lawful occupant" or that the victim was a "unlawful intruder." With regard to the "lawful occupant" instruction, the circuit court highlighted that petitioner's mother testified at trial that she expressly told petitioner to "stay away" from her house because he was "terrorizing us." This testimony does not support petitioner's claim that he was a "lawful occupant" in his parents' home. As for petitioner's

5

proposed "unlawful intruder" instruction, the court found that petitioner presented no evidence that the victim was not welcome in his parents' home. During her phone call with the victim hours before the shooting, Mrs. Putnam said only that, "If [petitioner is] not bothering anybody right now, just let him stay there and let him be, don't bother him." Therefore, she did not preclude the victim from going to her home, she merely asked him not to "bother" petitioner. Thus, the evidence at trial did not support petitioner's instruction that the victim was an "unlawful intruder" in his parents' home. Hence, we find no error.

Petitioner's fourth and final assignment of error is that the circuit court erred in admitting into evidence the .22-250 rifle found in his parents' house on the day of the shooting. Petitioner argues that the .22-250 rifle had no probative value pursuant to Rule 401 of the West Virginia Rules of Evidence given that the victim was shot by a .22 rifle, which was never found. Petitioner also claims that he was prejudiced when the circuit court allowed the jury to take the .22-250 rifle into the jury room during deliberations.

At trial, a forensic analyst from the State Police explained the testing performed on five items found at the crime scene: a fired bullet, a bullet fragment, two fired cartridges, and .22-250 rifle initially believed to be the weapon used by petitioner to shoot the victim. The analyst further testified that when the testing was finished he placed the five items together into a box that he sealed. The State offered the sealed box into evidence at trial. Petitioner objected to the admission of the .22-250 rifle on relevance grounds. The circuit court admitted the contents of the box and noted petitioner's objection. Thereafter, on both direct examination and cross-examination, the forensic analyst testified that he could not tie the .22-250 rifle admitted into evidence with the .22 bullet that killed the victim or with any of the other evidence contained within the box.

We have held that "'[t]he action of a trial court in admitting or excluding evidence in the exercise of its discretion will not be disturbed by the appellate court unless it appears that such action amounts to an abuse of discretion.' Point 10 Syllabus, *State v. Huffman*, 141 W.Va. 55, 87 S.E.2d 541 (1955)." *Casto v. Martin*, 159 W.Va. 761, 762, 230 S.E.2d 722, 724 (1976). Here, it appears the circuit court abused its discretion in admitting the .22-250 rifle over petitioner's objection given that it had no connection to the crime at issue in this case and, therefore, failed to satisfy Rule 401 of the Rules of Evidence. However, we have also held that "'[a] judgment will not be reversed because of the admission of improper or irrelevant evidence when it is clear that the verdict of the jury could not have been affected thereby.' Syllabus Point 7, *Starcher v. South Penn Oil Co.*, 81 W.Va. 587, 95 S.E. 28 (1918)." Syl. Pt. 7, *Torrence v. Kusminsky*, 185 W.Va. 734, 738, 408 S.E.2d 684, 688 (1991). Here, the verdict of the jury could not have been negatively affected by the admission of the .22-250 rifle given that, on both direct examination and cross-examination, the State's forensic expert testified that he could not tie the .22-250 rifle with the .22 bullet that killed the victim or with any of the other evidence contained within the box. For these same reasons, we find that any error the circuit court may have made in allowing the jury to take the .22-250 rifle into the jury room was not so prejudicial as to influence the outcome at trial. Consequently, we deny relief on this ground.

Accordingly, for the foregoing reasons, we affirm petitioner's conviction.

Affirmed.

**ISSUED:**  April 7, 2017

**CONCURRED IN BY:**

Chief Justice Allen H. Loughry II
Justice Robin Jean Davis
Justice Margaret L. Workman
Justice Menis E. Ketchum
Justice Elizabeth D. Walker