387 S.E.2d 542

**PINNACLE MINING COMPANY OF NORTHERN WEST VIRGINIA**

**v.**

**DUNCAN AIRCRAFT SALES OF FLORIDA, INC.**

**No. 18855.**

Supreme Court of Appeals of West Virginia.

Nov. 30, 1989.

George B. Armistead, Baker & Armistead, Morgantown, for Duncan Aircraft Sales of Florida.

Raymond H. Yackel, Oliver & Yackel, Morgantown, for Pinnacle Mining Co. of Northern West Virginia.

MILLER, Justice:

In this appeal, we are asked to determine whether the Circuit Court of Monongalia County erred in setting aside the jury verdict in favor of the defendant below, Duncan Aircraft Sales of Florida, Inc. (Duncan), on its counterclaim against the plaintiff below, Pinnacle Mining Company of Northern West Virginia (Pinnacle), and awarding a new trial on all issues. We find that the trial court erred.

## I.

Duncan is a Florida-based retail dealer of new and used commercial and private aircraft. In June, 1984, the owner of Pinnacle, Joseph Laurita, contacted Duncan about purchasing a used 1971 Hansa Jet S/N 1045, which was advertised in a magazine entitled "AC Flyer." The parties entered into negotiations for the sale of the aircraft. They subsequently agreed upon a price for the aircraft and for a downpayment, subject to the execution of a written contract.

In August, 1985, Duncan sent Pinnacle a contract for its approval. The contract provided for a purchase price of $270,000, with a $35,000 downpayment, in addition to other terms and conditions.

After reviewing the contract, Pinnacle advised Duncan that some of the terms of the contract were unacceptable. Pinnacle wanted two contracts of sale, one providing for the purchase of the aircraft engines only by another business owned by Mr. Laurita for a price of $135,000 and a deposit of $17,500, and the other providing for the purchase of the aircraft body by the plaintiff for $135,000, with a deposit of $17,500.[1] Under the terms of these contracts, Duncan was required to obtain certification of the airworthiness of the plane from Walker Aviation, a certified Hansa jet repair station. The contracts further provided that if Walker Aviation did not certify the plane as required, Pinnacle's deposit was to be refunded and the contracts terminated. These terms were accepted by Duncan, and the aircraft was delivered to Walker Aviation for certification.

In November, 1985, Walker Aviation certified the condition and safety of the aircraft, and Duncan advised Pinnacle that the plane was ready for delivery. Pinnacle, in a letter to Duncan dated January 3, 1986, questioned the certification. In a let-

---

**1.** James Kent, who assisted in the preparation of these contracts, testified that this division of the sale was intended to enable Pinnacle to take maximum advantage of the tax laws.

ter dated January 9, 1986, Duncan responded, advising Pinnacle either to fulfill the terms of the contract or to notify Duncan of its intention to breach the contract.

On March 17, 1986, Pinnacle sued Duncan for breach of contract and demanded that the contract be rescinded, that its downpayment be returned, and that punitive damages in the amount of $100,000 be awarded. Duncan filed an answer denying the allegations contained in the complaint and asserting that it had satisfied all conditions necessary to the performance of the contract. Duncan also filed a counterclaim requesting damages in excess of $125,000.

The trial began on November 12, 1986, and concluded on November 15, 1986. The jury returned a verdict against Pinnacle and in favor of Duncan on its counterclaim. It awarded Duncan $25,000 in damages and the deposit of $17,500 paid by the plaintiff. As earlier noted, the trial court set aside the jury verdict and granted a new trial.

## II.

■ Duncan's first contention is that the trial court erred in ruling that it improperly permitted the instructions to be taken to the jury room during deliberations in violation of Rule 51 of the West Virginia Rules of Civil Procedure. At the time this proceeding was initiated, Rule 51, W.Va.R.Civ. P., provided, in pertinent part: "Unless otherwise ordered by the court with the consent of all parties affected thereby, instructions shall not be shown to the jury or taken to the jury room." [2]

This Court has stated that under Rule 51, objections to jury instructions or to a court's charge must be noted in the record. *See Casto v. Martin,* 159 W.Va. 761, 230 S.E.2d 722 (1976), *quoting* Syllabus Point 4, *Ellison v. Wood & Bush Co.,* 153 W.Va. 506, 170 S.E.2d 321 (1969). Furthermore, objections cannot be raised for the first time in a post-trial motion to set aside the verdict. *Roberts v. Powell,* 157 W.Va. 199, 207 S.E.2d 123 (1973).

**2.** Effective January 1, 1989, Rule 51, W.Va. R.Civ.P., has been modified as follows: "The court may show the written instructions to the

Here, neither party objected on the record when the trial court announced that the jury would be permitted to take the instructions to the jury room. Furthermore, there is no indication from the record that the jury's access to these instructions was prejudicial to either party. For these reasons, we find that the trial court erred in granting a new trial on this issue.

## III.

■ Duncan's next contention is that the trial court erred in finding a new trial necessary because there was insufficient evidence that Duncan was the registered owner of the aircraft at the time of the contract. Our rule with regard to the sufficiency of the evidence is stated in Syllabus Point 5 of *Orr v. Crowder,* 173 W.Va. 335, 315 S.E.2d 593 (1984):

"In determining whether there is sufficient evidence to support a jury verdict the court should: (1) consider the evidence most favorable to the prevailing party; (2) assume that all conflicts in the evidence were resolved by the jury in favor of the prevailing party; (3) assume as proved all facts which the prevailing party's evidence tends to prove; and (4) give to the prevailing party the benefit of all favorable inferences which reasonably may be drawn from the facts proved."

*See also* Syllabus Point 4, *Bennett v. 3 C Coal Co.,* 180 W.Va. 665, 379 S.E.2d 388 (1989); Syllabus Point 3, *Vercellotti v. Bowen,* 179 W.Va. 650, 371 S.E.2d 371 (1988); Syllabus Point 6, *McClung v. Marion County Comm'n,* 178 W.Va. 444, 360 S.E.2d 221 (1987); Syllabus Point 4, *West Virginia Dep't of Highways v. Roda,* 177 W.Va. 323, 352 S.E.2d 134 (1986); Syllabus Point 3, *Hayseeds v. State Farm Fire & Cas.,* 177 W.Va. 323, 352 S.E.2d 73 (1986).

■ The jury heard testimony from Duncan's owner, Joseph Duncan, that when the plane was for sale it was titled in the name of Philco Aviation, of which Mr. Duncan owned 50 percent. Mr. Duncan further testified that title was subsequently transferred to Duncan Aircraft and that there

jury and permit the jury to take the written instructions to the jury room."

was no lien on the airplane at the time of the contract. Thus, there was sufficient evidence for the jury to find for Duncan on the title issue.

■ Moreover, under the sales portion of the Uniform Commercial Code (UCC), W.Va.Code, 46–2–101, *et seq.*, there is no requirement that the seller have title to the goods [3] at the time the contract is executed. In the absence of some specific language in the contract, it is sufficient if the seller has title at the time the goods are delivered. This is recognized in the UCC § 2–106(1), which provides for both present and future sales.[4] *See generally* R. Nordstrom, *Law of Sales* § 57 (1970); 67 Am.Jur.2d *Sales* § 244 (1985).

While this point appears not to have received a great deal of attention by the courts, it is clear that the UCC was designed to afford a more flexible approach to the title question.[5] The Maryland Supreme Court in *William F. Wilke, Inc. v. Cummins Diesel Engines, Inc.*, 252 Md. 611, 615, 250 A.2d 886, 889 (1969), made this summary:

"One of the more startling differences between the U.C.C. and the Sales Act is the U.C.C.'s adoption of a flexible contractual approach instead of following the more rigid concept of title to which the Sales Act adhered. *Girard Trust Corn Exchange Bank v. Warren Lepley Ford, Inc.*, 12 Pa.D. & C.2d 351 (1957); *Uniform Commercial Code Section; The Passage of Title,* Carrington, 14 Wyo.L.J. 17, 25 (1959); *The Law of Sales in the Proposed Uniform Commercial Code,* Williston, 63 Harv.L.Rev. 561, 581 (1950); *The Status of the Concept of Title in Article II of the Uniform Commercial Code,* 37 St. John's L.Rev. 178 (1962). *See also, Silver v. Sloop Silver Cloud,* 259 F.Supp. 187 (D.S.D.N.Y. 1966)." [6]

*See also Sheeskin v. Giant Food, Inc.*, 20 Md.App. 611, 318 A.2d 874 (1974); *Beasley v. Kerr–McGee Chem. Corp.*, 273 S.C. 523, 257 S.E.2d 726 (1979).

A further indication that title to goods need not exist when the contract for sale is made is found in UCC § 2–312, relating to the warranty of title. This provision states, in material part: "(1) Subject to subsection (2) there is in a contract for sale a warranty by the seller that (a) the title conveyed shall be good, and its transfer rightful[.]" [7] The Official Comment under this section states: "The warranty extends to a buyer whether or not the seller was in possession of the goods at the time the sale

---

**3.** The term "goods" is broadly defined in the UCC, which has been adopted in both Florida and West Virginia. " 'Goods' mean all things (including specially manufactured goods) which are movable at the time of identification to the contract for sale other than the money in which the price is to be paid, investment securities (article 8) [§ 46–8–101 et seq.] and things in action." W.Va.Code, 46–2–105(1); Fla.Stat.Ann. § 672.2–105(1) (West 1966). There is no contention that the sale of this airplane is not controlled by the UCC.

**4.** W.Va.Code, 46–2–106(1), provides, in pertinent part: " 'Contract for sale' includes both a present sale of goods and a contract to sell goods at a future time." This same language appears in Fla.Stat.Ann. § 672.2–106 (West 1966).

**5.** To support this point, reference is often made to this statement from the Official Comment to Section 2–101 of the UCC:

"The arrangement of the present Article is in terms of contract for sale and the various steps of its performance. The legal consequences are stated as following directly from the contract and action taken under it without resorting to the idea of when property or title passed or was to pass as being the determining factor." W.Va.Code, 46–2–101; Fla.Stat. Ann. § 672.2–101 (West 1966).

**6.** The forerunner to the UCC, the Uniform Sales Act, recognized in Section 13 that the seller need not have title to the goods at the time of the contract to sell, but only at the time of delivery:

"In a contract to sell or a sale, unless a contrary intention appears, there is—
(1) An implied warranty on the part of the seller that in the case of a sale he has a right to sell the goods, and that in the case of a contract to sell he will have a right to sell the goods at the time when the property is to pass[.]"

**7.** Subsection 2 of UCC § 2–312 states: "A warranty under subsection (1) will be excluded or modified only by specific language or by circumstances which give the buyer reason to know that the person selling does not claim title in himself or that he is purporting to sell only such right or title as he or a third person may have." There was no language in the sales contract in this case that required Duncan to have

or contract to sell was made." W.Va.Code, 46–2–312; Fla. Stat.Ann. § 672.2–312 (West 1966).

There was no evidentiary dispute that Duncan had good title to the aircraft when it was offered for delivery. Consequently, we find the trial court erred in setting aside the jury's verdict on this basis.

## IV.

■ Finally, the trial court set aside the jury's verdict partially in reliance on Pinnacle's contention that the required certification of airworthiness was not properly done. In support of its argument that the airplane was not airworthy, Pinnacle presented the testimony of John P. Nardi, a general contractor who is also an airplane pilot, and Charles Fowler, director of maintenance for Mobile Aviation Maintenance, Inc. Since Mr. Nardi was not a pilot of a Hansa jet or an aircraft mechanic, the court let him testify as a general expert, advising the jury to give "whatever weight they choose" to his testimony.

Mr. Nardi had reviewed invoices from Walker Aviation on the work done to the Hansa jet and testified that too much work had been performed on the aircraft for it to be airworthy. He had also reviewed the aircraft's log books and testified that the airplane had only one hour of actual flight time from November, 1985, to October 14, 1986. Mr. Nardi testified that after this flight, the logbooks reflected that problems arose with the transponder, the stick shaker, the vertical gyro, the flight computer, and the altimeter. He also stated that on this flight, the aircraft was flown with a ferry permit. Mr. Fowler's testimony paralleled Mr. Nardi's to some degree. Mr. Fowler also testified that the aircraft's certificate did not comply with the technical aspects of the Federal Aviation Association (FAA) certification.

Duncan introduced testimony to show the airworthiness of the aircraft and the sufficiency of the certification by Walker Aviation. David LaCroix, who had piloted the aircraft, and Don Haynes, the former chief mechanic at Walker Aviation, who had previously worked on the aircraft, testified on behalf of the defendant. Both of these witnesses testified as to their knowledge of the aircraft's log books and airworthiness. Mr. LaCroix and Mr. Haynes were joined by Curtis Yagle, a Hansa-certified aircraft inspector and the individual whose signature appears on the aircraft's log books at Walker Aviation, in testifying that the certification stamp used by Walker Aviation complied with FAA regulations.

■ Considering the conflicting testimony presented, the sufficiency of the certification was an issue for the jury to resolve. Our traditional rule on this point is set out in Syllabus Point 2 of *French v. Sinkford*, 132 W.Va. 66, 54 S.E.2d 38 (1948):

"Where, in the trial of an action at law before a jury, the evidence is conflicting, it is the province of the jury to resolve the conflict, and its verdict thereon will not be disturbed unless believed to be plainly wrong."

*See also* Syllabus Point 2, *Dustin v. Miller*, 180 W.Va. 186, 375 S.E.2d 818 (1988); Syllabus Point 2, *Rhodes v. National Homes Corp.*, 163 W.Va. 669, 263 S.E.2d 84 (1979).

We find that the case as a whole was fairly tried and that there was no error prejudicial to Pinnacle. Accordingly, we reverse the order of the Circuit Court of Monongalia County and reinstate the jury verdict in favor of Duncan.

Reversed.

title at the time the contract for sale was executed.