604 S.E.2d 449

**Buddy KEESEE, Individually, and as the Administrator of the Estate of Douglas Saville, Plaintiff Below, Appellant**

v.

**GENERAL REFUSE SERVICE, INC., Defendant Below, Appellee.**

No. 31615.

Supreme Court of Appeals of West Virginia.

Submitted April 13, 2004.

Decided June 29, 2004.

Joshua I. Barrett, Rudolph L. DiTrapano, DiTrapano, Barrett & DiPiero, Charleston, Timothy P. Rosinsky, Huntington, for Appellant.

R. Carter Elkins, Dustin C. Haley, Campbell, Woods, Bagley, Emerson, McNeer & Herndon, Huntington, Mennis E. Ketchum, II, Greene, Ketchum, Bailey & Tweel, Huntington, for Appellee.

## PER CURIAM:

In the instant case, the appellant, Buddy Keesee, individually, and as the administrator of the estate of Douglas Boyd Saville,[1] instituted a suit against General Refuse Service, Inc. ("GRS") asserting a deliberate intention action pursuant to W.Va.Code § 23–4–2(c)(2) (1994)[2], arising from the death of Mr. Saville on December 1, 1998. Mr. Keesee alleged an unsafe working condition existed at GRS because employees purportedly rode on the side step of the Pak–Rat[3] and that the side step was not intended to be a riding step. A jury trial commenced on October 29, 2002, and concluded on November 4, 2002, when the jury found that a specific unsafe working condition which presented a high degree of risk and strong probability of serious injury or death did not exist in the workplace of Mr. Saville. On December 10, 2002, the Circuit Court of Cabell County entered judgment in favor of GRS. Thereafter, on February 26, 2003, the circuit denied Mr. Keesee's subsequent motion for a new trial. Before this Court, Mr. Keesee appeals the adverse jury verdict and the circuit court's subsequent denial of his motion for a new trial. After reviewing the facts of the case, the issues presented, and the relevant statutory and case law, this Court affirms the decision of the circuit court.

## I.

### FACTS

On December 1, 1998, twenty-two-year-old Douglas Saville was killed in Cabell County while working in the employ of appellee, General Refuse Service, Inc. ("GRS"). He was run over and crushed to death by the

---

1. Mr. Saville was survived by his wife Sandra Saville, and a young son, James Tyler Saville. Upon Mr. Saville's death, Buddy Keesee, the personal representative of Mr. Saville's estate brought this action in 1999, and on October 29, 2002, a jury trial commenced.

2. W.Va.Code § 23–4–2 was amended in 2003. The portion of the statute at issue here, W.Va. Code § 23–4–2(c), was redesignated as W.Va. Code § 23–4–2(d), but the language was not changed, except for minor stylistic alterations. Since the 1994 version of the statute applies in this case, it will be referenced herein with the relevant portions set forth in detail where necessary.

3. The Pak–Rat is a container for collecting and hauling refuse or recyclables which is installed on a one-ton GMC truck.

Pak–Rat, a refuse collection truck, while he was working as a groundman[4] for GRS. No one witnessed the accident, however, there was no dispute that the death of Mr. Saville resulted from an impact with the vehicle that Mr. Danny Johnson was driving.[5] Instead, the dispute surrounded how the accident occurred.

In this case, Mr. Keesee contended that Mr. Saville was exposed to a specific unsafe working condition by riding on a loading step of the vehicle. Conversely, GRS argued that Mr. Saville was not riding on the step in question, and thus, the alleged specific unsafe working condition did not exist. GRS further argued that Mr. Saville's death was caused by the negligent acts of his co-employee, Mr. Johnson. In addition, GRS maintained that there was never a groundman assigned to the Pak–Rat as it was a single operation vehicle consisting solely of a driver who gets out of the vehicle to pick up trash or recyclables. As such, GRS argued that Mr. Saville was not trained to work around the Pak–Rat, nor was he assigned to the Pak–Rat. Instead, GRS stated that Mr. Saville was a groundman for a large rear-loader garbage truck and had received on-the-job training from an employee who had been with GRS for a time of between twenty and twenty-five years.

On the day of the accident, Mr. Saville had been assigned to work with Mr. Daniel Meadows on a truck driven by Mr. Verl Goodpasture. During trial, Mr. Johnson testified that Mr. Ronnie Finley, a member of GRS's management team, delivered Mr. Meadows and Mr. Saville to assist Mr. Johnson on the Pak–Rat as they had both completed their assigned route. Conversely, Mr. Meadows testified that he and Mr. Saville volunteered to help Mr. Johnson without the knowledge of Mr. Finley or any other management personnel. Later that day, Mr. Saville was killed when he was run over by the Pak–Rat.

After five days of trial, the jury returned a verdict in GRS's favor, answering "no" to the first interrogatory: "Do you find by a pre-

ponderance of the evidence, that a specific unsafe working condition existed in the workplace of Douglas Saville, which presented a high degree of risk and a strong probability of serious injury of death?" On December 10, 2002, judgment was entered for GRS. Thereafter, Mr. Keesee filed a motion for a new trial which was denied on February 26, 2003. This appeal followed.

## II.

### STANDARD OF REVIEW

In Syllabus Point 1 of *State v. Paynter,* 206 W.Va. 521, 526 S.E.2d 43 (1999), we held, "Where the issue on an appeal from the circuit court is clearly a question of law or involving an interpretation of a statute, we apply a *de novo* standard of review. Syllabus Point 1, *Chrystal R.M. v. Charlie A.L.,* 194 W.Va. 138, 459 S.E.2d 415 (1995)." We have further indicated that a circuit court's final order and ultimate disposition are reviewed under the abuse of discretion standard. *State ex rel. Hechler v. Christian Action Network,* 201 W.Va. 71, 491 S.E.2d 618 (1997). Moreover, in *Tennant v. Marion Health Care Foundation,* 194 W.Va. 97, 104, 459 S.E.2d 374, 381 (1995), we explained:

We review the rulings of the circuit court concerning a new trial and its conclusion as to the existence of reversible error under an abuse of discretion standard, and we review the circuit court's underlying factual findings under a clearly erroneous standard. Questions of law are subject to a *de novo* review.

We have also held that:

Although the ruling of a trial court in granting or denying a motion for a new trial is entitled to great respect and weight, the trial court's ruling will be reversed on appeal when it is clear that the trial court has acted under some misapprehension of the law or the evidence.

Syllabus Point 4, *Sanders v. Georgia–Pacific Corp.,* 159 W.Va. 621, 225 S.E.2d 218 (1976). *Accord, Stillwell v. The City of Wheeling,* 210 W.Va. 599, 604, 558 S.E.2d 598, 603 (2001);

---

4. A groundman is a refuse collector who throws trash into refuse vehicles.

5. GRS owned one Pak–Rat and Mr. Johnson was its sole operator.

Syllabus Point 1, *Andrews v. Reynolds Mem'l Hosp., Inc.*, 201 W.Va. 624, 499 S.E.2d 846 (1997). Moreover, in *Rollyson v. Jordan*, 205 W.Va. 368, 379, 518 S.E.2d 372, 383 (1999), we provided that: "Ordinarily, when a circuit court is afforded discretion in making a decision, this Court accords great deference to the lower court's determination. However, when we find that the lower court has abused its discretion, we will not hesitate to right the wrong that has been committed."

Additionally, when we are asked to decide if a jury received the proper instructions in a given trial our review is *de novo.* "As a general rule, the refusal to give a requested jury instruction is reviewed for an abuse of discretion. By contrast, the question of whether a jury was properly instructed is a question of law, and the review is *de novo.*' Syl. pt. 1, *State v. Hinkle*, 200 W.Va. 280, 489 S.E.2d 257 (1996)." Syllabus Point 2, *Foster v. Sakhai*, 210 W.Va. 716, 559 S.E.2d 53 (2001). Moreover, "[t]he formulation of jury instructions is within the broad discretion of a circuit court, and a circuit court's giving of an instruction is reviewed under an abuse of discretion standard. A verdict should not be disturbed based on the formulation of the language of the jury instructions so long as the instructions given as a whole are accurate and fair to both parties." Syllabus Point 6, *Tennant v. Marion Health Care Foundation, Inc.*, 194 W.Va. 97, 459 S.E.2d 374 (1995). We proceed with our examination of the assigned errors with these standards in mind.

## III.

### DISCUSSION

#### A. Clear Weight of the Evidence

We begin our review in this appeal with Mr. Keesee's argument that the jury's finding that Mr. Saville was not exposed to a specific unsafe working condition, which presented a high degree of risk and strong probability of serious injury or death, was against the clear weight of the evidence presented at trial. Mr. Keesee argues that it is undisputed that Mr. Saville was working on the Pak–Rat; that he was not trained to work on that vehicle or to recognize the

difference between a riding step or a loading step; and, that he was not trained to avoid riding on the step which was not specifically designed for riding. Mr. Keesee further argues that the evidence shows that it was the general practice at GRS that if a vehicle had a step, it was ridden. As such, Mr. Keesee asserts that the fact that the jury answered this question in the negative "strongly suggests the jury did not consider the evidence on this issue, but rather was persuaded by unrelated, prejudicial evidence and testimony . . . ."

We believe that Mr. Keesee's argument ignores the primary theory of GRS's defense which was that Mr. Saville was not on the side step of the Pak–Rat immediately prior to the fatal accident, and thus, an unsafe working condition did not exist. During trial, GRS provided evidence that its employees were trained effectively through on-the-job training and that there had been the absence of serious injuries in general at GRS for many years. In fact, Mr. Lawson testified that in his seventeen years with GRS no one had been "run over" or seriously injured in a work-related incident. Additionally, Mr. Finley testified that during his twenty-one years with the company there had not been an injury at GRS that was serious enough to require overnight hospitalization. Jurors further discovered that Mr. Saville was not trained to work around the Pak–Rat because he was not assigned to the Pak–Rat. Moreover, while one witness testified that Mr. Saville may have been riding on the step prior to having been run over by the truck, other testimony depicted that Mr. Saville was not riding on the Pak–Rat step immediately prior to the accident and that he had both feet on the ground. Additionally, it was GRS's contention that Mr. Johnson may have carelessly and negligently operated the Pak–Rat leading to Mr. Saville's death.

In Syllabus Point 3 of *Walker v. Monongahela Power Co.*, 147 W.Va. 825, 131 S.E.2d 736 (1963), we held:

In determining whether the verdict of a jury is supported by the evidence, every reasonable and legitimate inference, fairly arising from the evidence in favor of the

party for whom the verdict was returned, must be considered, and those facts, which the jury might properly find under the evidence, must be assumed as true.

Moreover, we similarly explained that,

In determining whether there is sufficient evidence to support a jury verdict the court should: (1) consider the evidence most favorable to the prevailing party; (2) assume that all conflicts in the evidence were resolved by the jury in favor of the prevailing party; (3) assume as proved all facts which the prevailing party's evidence tends to prove; and (4) give to the prevailing party the benefit of all favorable inferences which reasonably may be drawn from the facts proved.

Syllabus Point 5, *Orr v. Crowder*, 173 W.Va. 335, 315 S.E.2d 593 (1983); *accord, Pinnacle Mining v. Duncan Aircraft Sales*, 182 W.Va. 307, 387 S.E.2d 542 (1989); *Pote v. Jarrell*, 186 W.Va. 369, 412 S.E.2d 770 (1991) (per curiam); *Dodrill v. Nationwide Mut. Ins. Co.*, 201 W.Va. 1, 11, 491 S.E.2d 1, 11 (1996); *Finley v. Norfolk and Western Ry. Co.*, 208 W.Va. 276, 540 S.E.2d 144 (1999) (per curiam).

The jurors were charged with the task of assessing the credibility of the witnesses surrounding Mr. Saville's death and found that he was not exposed to a specific unsafe working condition. After reviewing the facts of this case in light of the authority cited, we cannot conclude that the jury's verdict was, in any regard, against the clear weight of the evidence.

## B. Collateral Source Rule

■ Mr. Keesee now claims that the circuit court abused its discretion by allowing GRS to introduce evidence that Ms. Saville receives social security benefits due to the death of her husband. Mr. Keesee argues that under the collateral source rule, inquiry as to whether the plaintiff has received payments from collateral sources is prohibited.

Initially, Mr. Keesee notes that the jury was aware that Doug Saville earned a gross income of $15,600 per year ($1,300 per month) prior to his death and that Ms. Saville was now receiving widow's benefits through workers' compensation in the amount of $628.58 per month. Mr. Keesee declares, however, that due to an improper inquiry by GRS, jurors were informed that Ms. Saville receives additional compensation from social security benefits, the amount of which they were free to speculate. Furthermore, Mr. Keesee states that GRS repeated this information during closing arguments and that jurors were led to believe Ms. Saville was most likely receiving as much or more money than Mr. Saville had earned prior to his death.

■ In Syllabus Point 1 of *Powroznik v. C. & W. Coal Co.*, 191 W.Va. 293, 445 S.E.2d 234 (1994), we provided: "In determining the excess or ultimate recovery in a deliberate intent suit against an employer under W.Va.Code [§ ]23–4–2(b) (1983), the amount of the workers' compensation benefits paid or due to be paid the plaintiff must be subtracted from that particular plaintiff's award of damages." In Syllabus Point 7 of *Ratlief v. Yokum*, 167 W.Va. 779, 280 S.E.2d 584 (1981), we held: "The collateral source rule normally operates to preclude the offsetting of payments made by health and accident insurance companies or other collateral sources as against the damages claimed by the injured party." In Syllabus Point 8 of *Ratlief*, we further provided:

The collateral source rule also ordinarily prohibits inquiry as to whether the plaintiff has received payments from collateral sources. This is based upon the theory that the jury may well reduce the damages based on the amounts that the plaintiff has been shown to have received from collateral sources.

Clearly, we expressed in *Ratlief*, the concern that a jury may inaccurately or unfairly determine the amount of damages to which a plaintiff is entitled. With that in mind, we believe that Mr. Keesee was entitled to present evidence with regard to the amount of damages necessary for just compensation without reference to other collateral sources such as Ms. Saville's social security income. Furthermore, it is our opinion that due to the introduction of an undetermined collateral income, jurors were left to speculate as to the exact amount of money Ms. Saville actually received above and beyond the workers'

compensation benefits. Such speculation with regard to Ms. Saville's financial status was furthered by GRS's counsel's closing argument. GRS argued:

> The statute, ladies and gentlemen, the statute is designed for things beyond Workers' Compensation. We know that Workers' Compensation is being paid. That's because Mr. Lawson met his obligation under the law of West Virginia to pay the premium on behalf of Douglas Saville to the Bureau of Employment Programs. We also know that Mr. Lawson made his payments of that portion of Doug Saville's social security and we know, as Daniel Selby told us, the full truth is what ᵇᵒnefits she's receiving from those two sources.

We believe that the introduction of such collateral source evidence would have been prejudicial to Mr. Keesee had the jury found in his favor on the issue of liability. Nonetheless, by finding against Mr. Keesee on the issue of GRS's liability, the jury did not reach the issue of damages. In *Ratlief*, the plaintiff argued that it was error for the circuit court to allow evidence to go to the jury concerning his medical insurance payments. In that case, during cross-examination of the plaintiff, it was induced that eighty percent of his medical bills had been paid by his own medical insurance company. 167 W.Va. at 787, 280 S.E.2d at 589. With *Ratlief*, it was our first occasion to determine whether evidence of payment from collateral sources constituted reversible error. After determining that such evidence was error in *Ratlief*, we decided that the error was harmless because the jury did not reach the damage issue as it had disposed of the case against the plaintiff on the liability issue. 167 W.Va. at 788, 280 S.E.2d at 590. *See also Daniel B. by Richard B. v. Ackerman*, 190 W.Va. 1, 4, 435 S.E.2d 1, 4 (1993) ("Because the jury found in favor of Appellant on thᵉ issue of liability, the reference to insurance had no impact on any damages the jury might have awarded had it reached the issue of damages.").

Similar to the situation in *Ratlief*, the jury in this case found against Mr. Keesee on the issue of liability when it decided that Mr. Saville was not exposed to a specific unsafe working condition, which presented a high degree of risk and strong probability of serious injury or death. As such, while we find that the introduction of evidence that Ms. Saville receives social security benefits due to the death of her husband was error, it was harmless error, and thus, not reversible error.

## C. Evidence of Relationship After Husband's Death

▆▆▆▆ Mr. Keesee next contends that the circuit court erred by allowing introduction of testimony regarding the fact that Ms. Saville began a relationship and became pregnant by Rodney Shepherd within five months of her husband's death. In Syllabus Point 4 of *Addair v. Bryant*, 168 W.Va. 306, 314, 284 S.E.2d 374, 380 (1981), we held that "[e]vidence of the remarriage of a surviving spouse, or the possibility of such remarriage, ordinarily is not admissible to mitigate damages in a wrongful death action." Mr. Keesee argues that the concerns underlying the rule in *Addair* are that damages are to be ascertained at the time of death without the speculative nature of the collateral benefits of the subsequent relationship. Mr. Keesee further contends that the evidence was irrelevant and highly prejudicial, and should have been excluded.

In *Addair*, the defendants' argument, with regard to the excessiveness of the $40,000 verdict, rested on the fact that the victim's wife had remarried during the six-year interval between the time of the accident and the date of the trial. In that case, to avoid any inference that the surviving spouse had or would financially benefit from remarriage, the circuit court declined to permit the introduction of evidence of her remarriage to mitigate her claim for pecuniary loss resulting from the death of her husband. 168 W.Va. at 313, 284 S.E.2d at 380.

In the case at hand, the introduction of the evidence did not violate the principles of *Addair* as such testimony did not touch upon any pecuniary matters and was admissible due to Ms. Saville's testimony relating to her emotional distress in the months following the accident. Thus, as Ms. Saville's new relationship was formed shortly after Mr.

Saville's death, it was relevant to the claim for sorrow, mental anguish, and emotional distress damages permitted by the wrongful death statute as outlined by W.Va.Code § 55–7–6(c)(1)(A) (1992).[6] Throughout her testimony, Ms. Saville dramatically described her sorrow and mental anguish during the months following the death of Mr. Saville. As such, her testimony made it permissible for GRS to recall Ms. Saville and question her regarding her relationship with Mr. Shepherd to show that despite her claims as to her suffering in the months following Mr. Saville's death, she began a new relationship within five months after the accident. Moreover, given the fact that Ms. Saville's relationship with another man was so intimate that she became pregnant within five months of her husband's death, it was reasonable for jurors to conclude that the relationship had actually commenced earlier than five months after her husband's death, and that her grief during the ensuing months may not have been as great as described by her during her direct examination. Therefore admission of such evidence was proper in the context of Ms. Saville's testimony regarding her emotional distress during the months immediately following the accident. In Syllabus Point 9 of *Tudor v. Charleston Area Medical Center, Inc.*, 203 W.Va. 111, 506 S.E.2d 554 (1997), this court provided:

> The West Virginia Rules of Evidence … allocate significant discretion to the trial court in making evidentiary … rulings. Thus, rulings on the admission of evidence … are committed to the discretion of the trial court. Absent a few exceptions, this Court will review evidentiary … rulings of the circuit court under an abuse of discretion standard."

Thus, the circuit court did not abuse its discretion as such evidence was admissible under the limited circumstances as presented by the facts of this case.

## D. Jury Instruction

▪▪▪▪ Mr. Keesee also contends that the circuit court erred in instructing the jury in this case. Initially, we emphasize that, "[a]s a general rule, objections to a trial judge's charge must be clear and explicit enough to tell the trial judge what the parties want done to correct the alleged error." *Skaggs v. Elk Run Coal Co., Inc.*, 198 W.Va. 51, 70, 479 S.E.2d 561, 580 (1996). Moreover, Rule 51 of the West Virginia Rules of Civil Procedure provides in pertinent part: "[n]o party may assign as error the giving or the refusal to give an instruction unless he objects thereto before the arguments to the jury are begun, stating distinctly, as to any given instruction, the matter to which he objects and the grounds of his objection[.]" Syllabus Point 1, *Shia v. Chvasta*, 180 W.Va. 510, 377 S.E.2d 644 (1988); *see also Casto v. Martin*, 159 W.Va. 761, 230 S.E.2d 722 (1976), *quoting* Syllabus Point 4, *Ellison v. Wood & Bush Co.*, 153 W.Va. 506, 170 S.E.2d 321 (1969). Furthermore, objections cannot be raised for the first time in a post-trial motion to set aside the verdict. *See* Syllabus Point 1, *Roberts v. Powell*, 157 W.Va. 199, 207 S.E.2d 123 (1973). Likewise, as we held in Syllabus Point 6 of *Page v. Columbia Natural Resources, Inc.*, 198 W.Va. 378, 480 S.E.2d 817 (1996), " '[a] litigant may not silently acquiesce to an alleged error, or actively contribute to such error, and then raise that error as a reason for reversal on appeal.' Syllabus Point 1, *Maples v. West Virginia Department of Commerce*, 197 W.Va. 318, 475 S.E.2d 410 (1996)."

▪▪▪▪ After reviewing the record in the case at hand, we conclude that Mr. Keesee's counsel did not properly object to the instructions in question that were presented to the jury. Accordingly, for Mr. Keesee's argument to survive it would be necessary for this Court to invoke the plain error doctrine. This Court explained the use of the plain error doctrine as follows in Syllabus Point 7

---

6. W.Va.Code § 55–7–6(c)(1)(A) provides:

The verdict of the jury shall include, but may not be limited to, damages for the following: (A) Sorrow, mental anguish, and solace which may include society, companionship, comfort, guidance, kindly offices and advice of the decedent; (B) compensation for reasonably expect-

ed loss of (i) income of the decedent, and (ii) services, protection, care and assistance provided by the decedent; (C) expenses for the care, treatment and hospitalization of the decedent incident to the injury resulting in death; and (D) reasonable funeral expenses.

of *Page:* " 'To trigger application of the 'plain error' doctrine, there must be (1) an error; (2) that is plain; (3) that affects substantial rights; and (4) seriously affects the fairness, integrity, or public reputation of the judicial proceedings.' Syllabus point 7, *State v. Miller,* 194 W.Va. 3, 459 S.E.2d 114 (1995)." Moreover, in Syllabus Point 4, in part, of *State v. England,* 180 W.Va. 342, 376 S.E.2d 548 (1988), this court stated that the plain error "doctrine is to be used sparingly and only in those circumstances where substantial rights are affected, or the truth-finding process is substantially impaired, or a miscarriage of justice would otherwise result." We have further explained:

A trial court's instructions to the jury must be a correct statement of the law and supported by the evidence. Jury instructions are reviewed by determining whether the charge, reviewed as a whole, sufficiently instructed the jury so they understood the issues involved and were not misle[d] by the law. A jury instruction cannot be dissected on appeal; instead, the entire instruction is looked at when determining its accuracy. A trial court, therefore, has broad discretion in formulating its charge to the jury, so long as the charge accurately reflects the law. Deference is given to a trial court's discretion concerning the specific wording of the instruction, and the precise extent and character of any specific instruction will be reviewed only for an abuse of discretion.

Syllabus Point 4, *State v. Guthrie,* 194 W.Va. 657, 461 S.E.2d 163 (1995).

With those standards in mind, Mr. Keesee argues that the circuit court committed plain error in giving the jury an instruction on the history of the deliberate intent statute based upon this Court's decision in *Mayles v. Shoney's, Inc.,* 185 W.Va. 88, 405 S.E.2d 15 (1990). In this regard, Mr. Keesee contends that this Court has repeatedly held that the only elements to be proven by a plaintiff in a deliberate intent case are the five elements set forth in W.Va.Code § 23–4–2(c)(2)(ii)(1994).[7] As such, Mr. Keesee states that by informing the jury of the legislative history of the statute and instructing the jury that "the Legislature intended to create a legislative standard for loss of that immunity of more narrow application and containing more specific mandatory elements than the common law tort system concept and standard of willful, wanton, and reckless misconduct[,]" the jury was misled as to Mr. Keesee's true burden.

■ In Syllabus Point 2 of *Mayles v. Shoney's, Inc.,* 185 W.Va. 88, 405 S.E.2d 15 (1990), we recognized that "[a] plaintiff may establish 'deliberate intention' in a civil action against an employer for a work-related injury by offering evidence to prove the five specific requirements provided in W.Va.Code § 23–4–2(c)(2)(ii) (1983)." Mr. Keesee's case against GRS is distinguishable from our decision in *Mayles.*[8]

---

7. W.Va.Code § 23–4–2(c)(2)(ii)(A)–(E) provides:

(A) That a specific unsafe working condition existed in the workplace which presented a high degree of risk and a strong probability of serious injury or death;

(B) That the employer had a subjective realization and an appreciation of the existence of such specific unsafe working condition and of the high degree of risk and the strong probability of serious injury or death presented by such specific unsafe working condition;

(C) That such specific unsafe working condition was a violation of a state or federal safety statute, rule or regulation, whether cited or not, or of a commonly accepted and well-known safety standard within the industry or business of such employer, which statute, rule, regulation or standard was specifically applicable to the particular work and working condition involved, as contrasted with a statute, rule, regulation or standard generally requir-

ing safe workplaces, equipment or working conditions;

(D) That notwithstanding the existence of the facts set forth in subparagraphs (A) through (C) hereof, such employer nevertheless thereafter exposed an employee to such specific unsafe working condition intentionally; and

(E) That such employee so exposed suffered serious injury or death as a direct and proximate result of such specific unsafe working condition.

8. In *Mayles,* the plaintiff had to carry a hot bucket of grease out of the restaurant and down a steep grassy slope to a disposal area while the restaurant manager knew that such conditions existed and consciously appreciated that such conditions were dangerous, but did not act to change the conditions. In the case at hand, GRS denies knowledge of an unsafe condition and specifically states that Mr. Saville was acting outside of the scope of his job duties by assisting

In *Mayles,* we approved a jury instruction that provided that a plaintiff "need only prove" the five statutory elements of W.Va. Code, 23-4-2(c)(2)(ii), because such words "were used to explain that no higher burden [of proof] existed." 185 W.Va. at 97, 405 S.E.2d at 24. We believe that our decision in *Mayles* is a correct statement of law and is not inconsistent with the instruction as provided in Mr. Keesee's case. In fact, in *Mayles,* we did not overrule or discuss any instruction similar to the one given in the case at hand. As such, after reviewing the instructions presented to the jury in this case, we reject Mr. Keesee's contention that such instruction required him to introduce evidence of factors beyond those stated in W.Va.Code § 23-4-2(c)(2)(ii). In fact, the circuit court's instructions simply provided a brief explanation of a deliberate intention action and accurately stated the law as provided by W.Va.Code § 23-4-2(c)(1).[9] Moreover, we find that the information provided by the instructions was helpful in explaining the five statutory elements to the jury. Thus, because the first element of our review for ascertaining whether reversible error resulted from the jury instruction has not been satisfied, *i.e.,* whether the instruction correctly stated the applicable law, we need not further address this matter. As such, based on our thorough review of the record, we decline Mr. Keesee's invitation to apply the plain error doctrine as we cannot say that the trial court's instruction was in fact "error" much less "plain error."

Mr. Johnson with the Pak-Rat, a vehicle for which he was not assigned.

9. W.Va.Code § 23-4-2(c)(1) provides:
   It is declared that enactment of this chapter and the establishment of the workers' compensation system in this chapter was and is intended to remove from the common law tort system all disputes between or among employers and employees regarding the compensation to be received for injury or death to an employee except as expressly provided in this chapter and to establish a system which compensates even though the injury or death of an employee may be caused by his or her own fault or the fault of a co-employee; that the immunity established in sections six and six-a, article two of this chapter is an essential aspect of this workers' compensation system; that the intent

### E. Evidentiary Issues

Lastly, Mr. Keesee maintains that the circuit court erred with regard to the admittance of two evidentiary matters.

### 1. OSHA Letter

Initially, Mr. Keesee argues that the circuit court committed error by failing to admit a letter explaining an agreed upon abatement written by GRS to the Occupational Safety and Health Administration (OSHA). Mr. Keesee contends that the absence of the letter prevented the jury from knowing the true nature of the settlement and the promises made by GRS to correct the violations as cited by OSHA. Conversely, GRS contends that the exact subsequent remedial measures taken by them were not necessary nor relevant to prove the deliberate intention claim. We disagree with Mr. Keesee's contention that the correspondence between GRS and OSHA should have been entered into evidence.

In this case, the jury was specifically informed that a settlement had occurred between GRS and OSHA based upon an OSHA citation requiring GRS to pay a penalty. Jurors learned that "[t]he Employer agrees to correct the violations as cited in the above citation or as amended below." We held in Syllabus Point 4 of *Doe v. Wal-Mart Stores, Inc.,* 210 W.Va. 664, 558 S.E.2d 663 (2001):

Pursuant to West Virginia Rules of Evidence Rule 407, evidence of subsequent remedial measures may be introduced for purposes of impeachment (1) when infer-

of the Legislature in providing immunity from common lawsuit was and is to protect those immunized from litigation outside the workers' compensation system except as expressly provided in this chapter; that, in enacting the immunity provisions of this chapter, the Legislature intended to create a legislative standard for loss of that immunity of more narrow application and containing more specific mandatory elements than the common law tort system concept and standard of willful, wanton and reckless misconduct; and that it was and is the legislative intent to promote prompt judicial resolution of the question of whether a suit prosecuted under the asserted authority of this section is or is not prohibited by the immunity granted under this chapter.

ences other than the defendant's prior negligence may be drawn therefrom or (2) when the defendant introduces evidence to prove that the condition alleged to have caused the plaintiff's injury was as safe as the circumstances would permit, and (3) the probative value of such evidence outweighs its potential prejudicial effect.

After a thorough review of the record, we find that the circuit court did not commit error with regard to admittance of the OSHA letter. The jury in this case was sufficiently informed of the contents of the letter, including the fact that GRS had to pay a penalty as well as the fact that the citation issued by OSHA was not dismissed. The circuit court properly weighed the probative value of the evidence and found that it was outweighed by its potential prejudicial effect, *i.e.*, to convince the jury that GRS was culpable for not taking such measures before the accident involving Mr. Saville.

### 2. Testimony

█ Lastly, Mr. Keesee contends that he was prejudiced by the circuit court's refusal to allow him to testify that Mr. Lawson and Mr. Finley told him that Mr. Saville was riding on the step just before the accident. Mr. Keesee argues that such comments constituted an admission by a party opponent and were not hearsay.

Upon reviewing the record, we believe that such statements from Mr. Lawson or Mr. Finley, even if accurate, were not admissions by GRS, and simply were not admissible. It is undisputed that neither Mr. Lawson nor

Mr. Finley were present when the accident occurred and thus, any comments they may have made were based on comments relayed to them by others. Therefore, such statements do not meet the requirements of W. Va. R. Evid. 801(d)(2) [10] as an exception to the hearsay rule. Moreover, even though the circuit court specifically refused to allow such hearsay testimony, Mr. Keesee's counsel nevertheless questioned Mr. Finley, in front of the jury, as to whether or not he told Mr. Keesee that Mr. Saville was killed because he fell off the step. As such, even though Mr. Finley denied that he made those statements, Mr. Keesee was still able to inform the jury that he was told that Mr. Saville had fallen off the step. Consequently, we find that the circuit court did not commit error.

### IV.

### CONCLUSION

For the reasons set forth above, the December 10, 2002, final order of the Circuit Court of Cabell County is affirmed.

Affirmed.

Justice McGRAW dissents.

---

10. W.Va. Rule of Evidence 801(d)(2) provides:
    Admission by Party–Opponent. The statement is offered against a party and is (A) the party's own statement, in either an individual or a representative capacity, or (B) a statement of which the party has manifested an adoption or belief in its truth, or (C) a statement by a person authorized by the party to make a statement concerning the subject, or (D) a statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship, or (E) a statement by a co-conspirator of a party during the course and in furtherance of the conspiracy.