WILLIAM F. WILKE, INC. *v.* CUMMINS
DIESEL ENGINES, INC.

[No. 130, September Term, 1968.]

612

*Decided March 10, 1969.*

The cause was argued before HAMMOND, C. J., and MAR-BURY, McWILLIAMS, FINAN and SINGLEY, JJ.

*Donald N. Rothman* and *Robert E. Sharkey,* with whom were *Allan J. Malester* and *Gordon, Feinblatt & Rothman* on the brief, for appellant.

*Clarke Murphy, Jr.,* with whom were *White, Page & Lentz* on the brief, for appellee.

SINGLEY, J., delivered the opinion of the Court.

The dilemma which this controversy posed for the trial court was aptly put by Alexander Pope more than two centuries ago: "Be not the first by whom the new are try'd, Nor yet the last to lay the old aside." [1] A resolution of the problem calls for a deep draft from Pope's Pierian spring.[2]

---

1. Pope, *Essays on Criticism* (1711) Part II, Line 133. Alexander Pope: *Selected Works* (Mod. Lib. Ed. 1951) at 41.
2. *Ibid,* Part I, Line 15 at 38.

William F. Wilke, Inc. (Wilke), the appellant here and plaintiff below, is a mechanical contractor who was a subcontractor on a job involving the construction of certain facilities for the United States government at Aberdeen Proving Ground. The performance of the contract required, among other things, that Wilke supply and install an emergency diesel-powered generator in conformance with government specifications. After a discussion with representatives of Cummins Diesel Engines, Inc. (Cummins), the appellee here and defendant below, Wilke received a quotation from them dated 14 July 1965. On 3 August 1965, Wilke issued a purchase order for an emergency diesel generator "in strict compliance with plans and specifications * * * complete in all respects, *including all required tests* for the sum of Thirteen Thousand Three Hundred Dollars ($13,-300).[3] *This price includes all requirements as set forth in paragraph 39.22* [the portion of the government specifications which dealt with the emergency diesel generator] *except subparagraphs k and l*" [which dealt with the fuel oil storage tank, the cleaning and painting of such tanks, and oil pipe and fittings]. (Emphasis added)

The job progressed with agonizing slowness, and by August 1966 was only 50% complete. Although it was far too early to install the generator, Cummins was anxious to deliver it to the job site and did so on 17 August 1966. It was delivered by Cummins' truck, unloaded by Wilke's crane and placed on a permanent base which had been prepared for it. At the time of delivery, the generator was lacking two starting batteries. When asked how Cummins' representative explained the absence of the batteries, Wilke's foreman at the job answered: "He said the batteries were not in the machine because he did not want us to start it or fool with it. His statement was, 'This is my baby until I start it and turn it over to you.' " This testimony was not challenged by Cummins. Also missing were the maintenance and operating instruction manuals that were included in the specifications.

---

**3.** The parties agree that the stipulated price of $13,300 was the result of a mathematical error, and that the correct figure should have been $13,500.

On 18 August 1966, Cummins billed Wilke for $13,500, and on 27 September, Wilke sent Cummins a check for $13,300, telling them that the remaining $200 would be paid after start-up and field tests.

The job continued to move at a snail's pace, and until the spring of 1967 the generator sat on its base enclosed in a housing intended to protect it from the weather since it was designed to operate out of doors. When Wilke started to hook up the generator it was discovered that the water in its cooling system had frozen during the previous winter, and that the engine had been severely damaged.

Wilke notified Cummins of the damage, and Cummins, after an investigation, decided that repairs could not be made on the job site. The generator was picked up by Cummins and taken away to be repaired. There were no discussions between the parties as to the responsibility for the repairs prior to their completion. On 9 June, Cummins sent Wilke a bill for $2,231.20 for the work and conditioned return of the generator on the payment of the bill. On 19 June, Wilke instituted an action of replevin, and on that same day, Cummins sent Wilke a corrected bill in the amount of $2,798.27. The generator was returned to the job site where Cummins supervised the electrical installation, start-up and field tests. In April of 1968, the replevin action was tried without a jury by the Superior Court of Baltimore City which, on 8 April 1968, entered judgment absolute in favor of Cummins for the return of the property or, alternatively, for $2,798.27, one cent damages and costs. It is from this judgment that Wilke has appealed.

The court below concluded that "title did pass at the time of delivery of the machine; and that the tests which were to be made thereafter were not a condition to the passing of title" and that "the implication is that when someone in this kind of business (Cummins) is told that it is necessary that [the generator] be put into operation; these circumstances justify Cummins' conclusion that they have an implied order to repair * * * [which] carries with it the responsibility of payment for the repairs before the machine can be released from the custody of the repairman."

Wilke contends that this result and the reasons given in sup-

port of it could possibly have been a correct statement of the law under the Uniform Sales Act (the Sales Act),[4] which was repealed in Maryland by Chapter 583 of the Laws of 1963, but is at "cross purposes" with the Uniform Commercial Code (U.C.C.), Maryland Code (1957, 1964 Repl. Vol.) Art. 95 B, §§ 1-101 ff, which has been in force in Maryland since 1 February 1964. Since we agree with this, we need not reach Wilke's allegation that the damage was caused by Cummins' negligence, or Cummins' contention that Wilke was responsible for the care of the generator and for the cost of repairs.

One of the more startling differences between the U.C.C. and the Sales Act is the U.C.C.'s adoption of a flexible contractual approach instead of following the more rigid concept of title to which the Sales Act adhered. *Girard Trust Corn Exchange Bank v. Warren Lepley Ford, Inc.,* 12 Pa. D. & C. 2d 351 (1957); *Uniform Commercial Code Section; The Passage of Title,* Carrington, 14 Wyo. L. J. 17, 25 (1959); *The Law of Sales in the Proposed Uniform Commercial Code,* Williston, 63 Harv. L. Rev. 561, 581 (1950); *The Status of the Concept of Title in Article II of the Uniform Commercial Code,* 37 St. John's L. Rev. 178 (1962). *See also, Silver v. Sloop Silver Cloud,* 259 F. Supp. 187 (D.S.D. N.Y. 1966).

The Official Comment to U.C.C. § 2-101, the first section in the Subtitle on Sales, puts it this way:

> "The arrangement of the present Subtitle is in terms of contract for sale and the various steps of its performance. The legal consequences are stated as following directly from the contract and action taken under it without resorting to the idea of when property or title passed or was to pass as being the determining factor. *The purpose is to avoid making practical issues between practical men turn upon the location of an intangible something, the passing of which no man can*

---

4. Even under the Sales Act, Maryland Code (1957) Art. 83, §§ 40, 68, when a buyer had the right to test goods after delivery, and the right to refuse them if they did not pass the tests, title and risk of loss were held not to have passed until acceptance. *Agri Manufacturing Co. v. Atlantic Fertilizer Co.,* 129 Md. 42, 98 A. 365 (1916).

*prove by evidence and to substitute for such abstractions proof of words and actions of a tangible character."* (Emphasis added)

Hawkland, *A Transactional Guide to the Uniform Commercial Code* (1964), goes somewhat further:

"Under the U.C.C. the location of title is relatively unimportant, because the Code rejects the 'lump-concept approach' of the common law and U.S.A. [Uniform Sales Act]. At common law and under the U.S.A. the approach was to decide under the specific facts of a case that the 'title' was in the seller or the buyer, a 'wide-premise decision,' which then dictated the answers to many unrelated problems, such as risk of loss, liability for price as against mere damages, liability for taxes, standing to sue third party tort feasors, and the like. A decision on title in one case was authority for a decision on title in another, even though the particular issues to be decided in the two cases were radically different.

"The U.C.C. has adopted the policy of 'narrow-issue' thinking. A number of specific rules govern the rights and duties of the buyer and seller, and often these provisions are not predicated upon ownership considerations. *Under the U.C.C., the analysis of a sales problem does not start with a location of title, but with an analysis of the problem in terms of narrow issues and an ascertainment of whether or not the U.C.C. contains specific provisions dealing with these issues. If it does, those rules govern the transaction, and title will play no part in its solution.* If it does not, the title concept may still be employed." (Emphasis added) Hawkland, *supra,* § 1.2401 at 143.

If we analyze the problem before us in terms of what Dean Hawkland calls the "narrow issues" and then ascertain how these are dealt with by the U.C.C., we come unerringly to the conclusion that, in the absence of a delivery of conforming goods, the risk of damage remained with Cummins, the seller,

notwithstanding the delivery of the generator to the job site, the receipt of payment from Wilke, and some eight months' delay in start-up.

U.C.C. § 2-401 follows the contractual approach in providing that title cannot pass prior to the identification of the goods to the contract; that it will pass "in any manner and on any conditions explicitly agreed on by the parties"; and in the absence of explicit agreement, that it will pass "at the time and place at which the seller completes his performance with reference to the physical delivery of the goods, * * *" This is described in the Official Comment as the "step by step" performance of the contract. *Cf. Silver v. Sloop Silver Cloud, supra.* Hawkland, *supra,* § 1.3202 at 184 adds a cautionary note:

> "The seller does not fully perform his contract merely by getting *goods* to the right place at the right time, and thereafter making them available to the buyer. He must get 'conforming' goods to the right place at the right time and properly tender them."

The narrow issue here is, whether Cummins made a "delivery" of goods which conformed to the contract. It will be recalled that Wilke's purchase order specifically incorporated the government specifications, which consisted of two and a half pages of single-spaced typescript which detailed the field tests to be performed prior to acceptance by the government. That these tests were not intended to be an empty ritual can be indicated by a random selection of a few of them. The generator was to be operated for eight hours at 75% of rated load; then operated for eight hours at 100% of rated load; and finally operated for two hours at 110% of rated load. Other provisions required an inspection of the generator's components and the hourly recording of data during the field tests. Further provisions set out an elaborate formula for the development of a rebate should fuel consumption exceed certain standards and described the tests to be made by the Signal Corps to ascertain whether radio interference had developed.

U.C.C. § 2-106 (2) provides that "Goods or conduct including any part of a performance are 'conforming' or conform to the contract when they are in accordance with the obligations

under the contract." Non-conformity cannot be viewed as a question of the quantity and quality of goods alone, but of the performance of the totality of the seller's contractual undertaking. *Campbell v. Pollack,*     R. I.    , 221 A. 2d 615 (1966). § 2-510 (1) reads, "Where a tender or delivery of goods so fails to conform to the contract as to give a right of rejection the risk of their loss remains on the seller until cure or acceptance" and the Official Comment notes, "Under subsection (1) [of § 2-510] the seller by his individual action cannot shift the risk of loss to the buyer unless his action conforms with all the conditions resting on him under the contract."

Under the facts of this case, we have no difficulty in holding that the delivery of the generator to the job site, while identifying the goods to the contract, did not amount to a delivery of goods or the performance of obligations conforming to the contract. It could not constitute such a delivery and performance until the generator had been installed, started up, and field tests completed to the satisfaction of the government. Until then, risk of loss remained with Cummins regardless of where title may have stood.[5]

While it is conceivable that a negligent act could be postulated which would have made it possible to hold Wilke responsible for the cost of repairing the damage, such a course of conduct is absent here. The generator, when delivered, was completely enclosed and had been delivered in an inoperable condition so that no one could "start it or fool with it" until it was "turned over" to Wilke. On these facts, the judgment in Cummins' favor was clearly erroneous.

> *Judgment reversed; costs to be paid*
> *by appellee.*

---

5. Wilke instituted replevin in reliance on U.C.C. § 2-716 (3) which gives the buyer such a right once the goods have been identified to the contract, if he is unable to "cover."