IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs August 2, 2013


**3L COMMUNICATIONS L.L.C.  v.  JODI  MEROLA, INDIVIDUALLY, and
d/b/a NY TELECOM  SUPPLY**


**Direct Appeal from the Circuit Court for Montgomery County
No. MCCCCV OD09-0455      Ross H. Hicks, Judge**

---

**No. M2012-02163-COA-R3-CV - Filed September 6, 2013**

---

Appellee/Buyer purchased certain telecommunications equipment from Appellant/Seller.  Upon inspection, Appellee discovered the equipment was defective and rejected the goods.  Appellant contends that the returned goods were never delivered and that Appellee bears the risk of loss under the Tennessee Uniform Commercial Code.  The trial court entered judgment in favor of the Appellee/Buyer, finding that, under Tennessee Code Annotated Section 47-2-510, the risk of loss remained with Appellant/Seller.  Appellant appeals this finding, as well as the award of prejudgment interest and attorney fees in favor of Appellee.  We reverse the award of attorney fees.  The judgment is otherwise affirmed. Reversed in part, affirmed in part, and remanded.


**Tenn. R. App. P. 3. Appeal as of Right; Judgment of the Circuit Court Reversed in
Part; Affirmed in Part and Remanded**


J. STEVEN STAFFORD, J., delivered the opinion of the Court, in which ALAN E. HIGHERS, P.J.,W.S., and DAVID R. FARMER, J., joined.


Jodi Merola, LaFayette, New York, Pro Se.


Raymond F. Runyon, Clarksville, Tennessee, for the appellee, 3L Communications L.L.C.


**OPINION**


3L Communications, L.L.C. ("3L," or "Appellee") is a Tennessee limited liability company, with its principal place of business in Montgomery County, Tennessee.  3L is owned by Marlin Huddleston and is in the business of buying and selling "high-end optical telecommunications equipment."  Jodi Merola, d/b/a NY Telecom Supply and NY Telecom and Network Supply, L.L.C. ("Ms. Merola," or "Appellant") has its principal place of

business in LaFayette, New York and, like 3L, is in the telecommunications equipment business.

In the Fall of 2008, 3L posted, on an internet site used by wholesalers wishing to buy or sell telecommunications equipment, that it was looking to purchase "10 gig optical boards." In response to the website posting, Ms. Merola contacted Mr. Huddleston by email, asking how many boards he needed and what price he wished to pay. On November 21, 2008, 3L purchased five circuit boards from Ms. Merola. According to Mr. Huddleston's testimony, Ms. Merola represented to 3L that the boards had been tested and "were in great shape." Under the terms of the parties' agreement, Ms. Merola shipped the circuit boards *via* Federal Express, with the balance of $35,090.60 (i.e., approximately $7,000.00 per circuit board) due on delivery. Mr. Huddleston testified that the industry practice is to ship merchandise "COD company check," meaning that the merchant receiving the merchandise may pay by company check. In his dealings with Ms. Merola, however, Mr. Huddleston was required to pay "COD cashier's check." Mr. Huddleston testified that he was told by Ms. Merola that the requirement for a cashier's check was because this was the first time that 3L had done business with Ms. Merola's company. At any rate, the circuit boards arrived at 3L on November 23, 2008, and 3L paid for the merchandise by cashier's check. However, upon inspection of the circuit boards, Mr. Huddleston discovered that the boards were damaged, and were not as Ms. Merola had described. Specifically, Mr. Huddleston testified that the box contained:

> [T]he biggest bunch of crap I'd ever seen. The boards had what I call "jumper repair," and that is wiring that goes on the circuitry bypassing certain circuits that are probably bad, and that's why people do it. And no corporate–we sell to primarily corporat[ions], and a corporat[ion] will not buy these kind of sloppy boards ever, and they were covered with ["jumper" repairs]. And not only that, one of the boards didn't even have a serial number . . . .

Mr. Huddleston immediately contacted Ms. Merola. After some discussion, 3L agreed to let the third party (to whom 3L was selling the boards) inspect the boards to see if they were salvageable. When it was determined that the boards were unuseable, 3L contacted Ms. Merola to return the shipment. At that time, Ms. Merola sent a response email, stating:

> Marlin–I'm leaving for Canada on business in the morning—then to California, returning next wee[k]. Please hold off on any COD shipments until I can process the RMA [i.e., return material authorization]—will need to know "what" is

wrong with the boards and all that policy/procedure "stuff"—thanks a bunch.

On December 10, 2008, Ms. Merola sent the following email to 3L:

Marlin—sorry—I've been traveling all day and more of the same tomorrow and Friday—so thanks for your patience. I have an RMA # for you—the boards have to be returned via FEDEX Ground on our account or however you wish on your own account (if faster) and then we have to send them through testing—soak them 24 hours—and be sure everything is the same as when they left . . . . FEDEX GRND ACCT is [XXXXX7061] and please specify RMA #981.

Pursuant to the foregoing instructions, on December 12, 2008, 3L shipped the boards back to Ms. Merola, using the Federal Express account number she had given. Mr. Huddleston testified that the boards were returned "[e]xactly as she instructed me to do;" he explained that he "put on every flat surface on the box in big black letters the RMA . . . number, and [3L] sent it on her account, ground, FedEx." The package was sent to the address given by Ms. Merola: NY Telecomm Supply, 2582 Seabury Drive, Suite B, Lafayette, New York." A Federal Express tracking number, 322012010028737, was issued for the transaction.

On December 17, 2008, 3L sent an email message to Ms. Merola regarding the refund for the boards. Ms. Merola responded that, to date, she had not received the returned boards, but that it appeared that they would be received later that week. On December 26, 2008, Ms. Merola sent an email to 3L, indicating that "we're off until the 29th for the most part" and that "[w]e haven't received the boards yet." Ms. Merola further inquired as to whether the boards had been shipped "ground on your account as per the RMA instruction?" When 3L responded that the Federal Express tracking number showed that the boards were delivered on December 18, 2008, Ms. Merola stated that it was never "on our receiving manifest." 3L responded by asking Ms. Merola to "check with your people and see what's going on? If [the package] was dropped off on Thursday, then there should have been people around to notice it?" Ms. Merola responded that "we're not back until Monday." Mr. Robert Alomar, a Federal Express employee, testified at the hearing that the Federal Express driver verification form indicated that the delivery address "is not an apartment or office," and that the delivery person had "called customer [i.e., Ms. Merola] before delivering." Federal Express records, admitted into evidence, show that the returned package was, in fact, delivered.

Email and telephone calls continued between the parties until 3L became suspicious and began researching Ms. Merola and her business. Allegedly, 3L discovered that Ms. Merola did not have a boss, as "she runs the company herself and she is the only employee." In addition, 3L discovered that the business address given by Ms. Merola was actually a residential home. Although 3L had allegedly been told that Ms. Merola "had a ton of shipments in and out that week," it learned from Federal Express that "there's nothing—no boxes going out of there at all hardly." 3L also learned that Ms. Merola did not have a test lab, and that the "suite" number on the business address did not exist. When 3L confronted Ms. Merola with this information, she allegedly stopped all communication and the instant lawsuit was filed.

On March 20, 2009, 3L filed a complaint against Jodi Merola, individually, and d/b/a NY Telecom Supply, seeking damages for breach of contract and violation of the Tennessee Consumer Protection Act of 1977. The complaint was amended on October 30, 2009, to include NY Telecom and Network Supply, L.L.C. as a party-defendant. On February 10, 2010, Ms. Merola filed an answer, denying the material allegations contained in the amended complaint. Concurrent with her answer, Ms. Merola filed a counterclaim, arguing that 3L had the "risk of loss" for the returned boards; accordingly, Ms. Merola asked the trial court to dismiss 3L's amended complaint.

The parties engaged in protracted discovery. On September 7, 2011, the trial court entered an order, setting the case for hearing on December 7, 2011. However, on December 6, 2007, counsel for Ms. Merola entered a motion to withdraw and for a continuance. The motion was granted and the trial was rescheduled for March 12, 2012. On February 21, 2012, Ms. Merola, who was acting *pro se* at this point, filed a motion to continue the trial date. Her motion was granted and the date for trial was reset for August 30, 2012.

Following the hearing, the trial court entered judgment in favor of 3L on September 4, 2012. In relevant part, the judgment states:

> 1. Plaintiff and Defendants engaged in a commercial transaction. The risk of loss in this matter did not pass to the Plaintiff as the goods tendered by Defendants were rejected by Plaintiff. As such, the risk of loss remained with Defendants throughout this transaction.
>
> 2. The proof in this matter shows that Plaintiff purchased circuit boards from Defendants for the sum of . . . $35,060.90. These circuit boards were delivered to Plaintiff via COD, which was paid for by Plaintiff through a cashier's check. Plaintiff, upon

inspection of the circuit boards, immediately rejected same and requested information from Defendants to return the circuit boards to them. Defendants provided Plaintiff with instructions to return the circuit boards to them and Plaintiff followed the instructions provided by Defendants. As Plaintiff followed the instructions provided by Defendants, the risk of loss remained with Defendants and a judgment should enter against Defendants for . . . $35,060.90.

3. Prejudgment interest at the rate of six percent (6%) accruing on December 12, 2008, through August 30, 2012, is taxed to Defendants and a judgment is awarded to Plaintiff for prejudgment interest in the total amount of . . . $7,799.05.

\*                              \*                              \*

5. Plaintiff is entitled to an award of attorney fees in bringing this action. The Court has reviewed the affidavit of attorney fees submitted by counsel for Plaintiff and finds that Plaintiff incurred attorney fees in the amount of . . . $6,819.17. Plaintiff is awarded a judgment against Defendants in the amount of $6,819.17, for its attorney fees incurred in this matter.

Ms. Merola appeals, raising five issues for review. We restate those issues as follows:

1. Whether the trial court correctly applied the Uniform Commercial Code to the facts of this case?

2. Whether the existence of insurance was properly raised in the trial court?

3. Whether Ms. Merola was treated fairly as a *pro se* litigant?

4. Whether the trial court erred in its award of attorney fees to 3L?

5. Whether the trial court erred in awarding pre-judgment interest in this case?

Because this case was tried by the court, sitting without a jury, this Court conducts a

*de novo* review of the trial court's decision with a presumption of correctness as to the trial court's findings of fact, unless the evidence preponderates against those findings. **Wood v. Starko**, 197 S.W.3d 255, 257 (Tenn. Ct. App. 2006). For the evidence to preponderate against a trial court's finding of fact, it must support another finding of fact with greater convincing effect. **Walker v. Sidney Gilreath & Assocs.**, 40 S.W.3d 66, 71 (Tenn. Ct. App. 2000); **The Realty Shop, Inc. v. R.R. Westminster Holding, Inc**., 7 S.W.3d 581, 596 (Tenn. Ct. App. 1999). This Court reviews the trial court's resolution of legal issues without a presumption of correctness. **Johnson v. Johnson**, 37 S.W.3d 892, 894 (Tenn. 2001).

## Applicability of the Uniform Commercial Code

In the instant case, it is undisputed that 3L is a merchant, dealing in the buying and selling of telecommunications equipment. In her testimony at the hearing of this case, Ms. Merola described herself as an "independent broker." When asked why, in her email correspondence with Mr. Huddleston, Ms. Merola used "we" and "us" to describe her company, despite the fact that she was the only person working at the company, she explained: "We, the company. Me, NY Telecom Supply; me and my husband at the time, that was us." Tennessee Code Annotated Section 47-2-104(1) defines a "Merchant" as:

> [A] person who deals in goods of the kind or otherwise by his occupation holds himself out as having knowledge or skill peculiar to the practices or goods involved in the transaction or to whom such knowledge or skill may be attributed by his employment of an agent or broker or other intermediary who by his occupation holds himself out as having such knowledge or skill.

Pursuant to this definition, we can only conclude that Ms. Merola, through NY Telecom Supply, did sell telecommunications goods and did otherwise hold herself out as telecommunications equipment merchant. Accordingly, she was a merchant under the Uniform Commercial Code ("UCC") definition.

Although it sometimes sold telecommunications equipment, 3L was the buyer in the instant case. Tennessee Code Annotated Section 47-2-601 provides:

> Subject to the provisions of this chapter on breach in installment contracts (§ 47-2-612) and unless otherwise agreed under the sections on contractual limitations of remedy (§§ 47-2-718 and 47-2-719), if the goods or the tender of delivery fail in any respect to conform to the contract, the buyer may:

(a) reject the whole; or

(b) accept the whole; or

(c) accept any commercial unit or units and reject the rest.

It is undisputed that Ms. Merola indicated that the boards she sold to 3L had been tested and were in good condition. It is also undisputed that, upon inspection of the boards, Mr. Huddleston discovered that there were certain problems with them, as described above. Mr. Huddleston notified Ms. Merola of the problems, and ultimately rejected all of the boards as non-conforming with the parties' agreement and sent them back to Ms. Merola per her instructions. Tenn. Code Ann. §47-2-601(a). Ms. Merola claims that the boards never arrived at her address. Accordingly, the question arises whether Ms. Merola or 3L must bear the risk of loss in this case.

Tennessee Code Annotated Section 47-2-509 provides, in relevant part:

(1) Where the contract requires or authorizes the seller to ship the goods by carrier:

(A) If it does not require him to deliver them at a particular destination, the risk of loss passes to the buyer when the goods are duly delivered to the carrier even though the shipment is under reservation (§ 47-2-505); but

(B) If it does require him to deliver them at a particular destination and the goods are there duly tendered while in the possession of the carrier, the risk of loss passes to the buyer when the goods are there duly so tendered as to enable the buyer to take delivery.

\*                              \*                              \*

(3) In any case not within subsection (1) or (2), the risk of loss passes to the buyer on his receipt of the goods if the seller is a merchant; otherwise the risk passes to the buyer on tender of delivery.

(4) The provisions of this section are subject to contrary agreement of the parties and to the provisions of this chapter on sale on approval (§ 47-2-327) and on effect of breach on risk of loss (§ 47-2-510).

Tennessee Code Annotated Section 47-2-510 provides an exception to the foregoing statute, stating:

> (1) Where a tender or delivery of goods so fails to conform to the contract as to give a right of rejection the risk of their loss remains on the seller until cure or acceptance.
> (2) Where the buyer rightfully revokes acceptance he may to the extent of any deficiency in his effective insurance coverage treat the risk of loss as having rested on the seller from the beginning.
> (3) Where the buyer as to conforming goods already identified to the contract for sale repudiates or is otherwise in breach before risk of their loss has passed to him, the seller may to the extent of any deficiency in his effective insurance coverage treat the risk of loss as resting on the buyer for a commercially reasonable time.

As noted in Comment 1 to Section 47-2-510, one of the purposes of the statute is "[t]o make clear that, "[u]nder subsection (1) the seller by his individual action cannot shift the risk of loss to the buyer unless his action conforms with all the conditions resting on him under the contract." One of the few Tennessee cases dealing directly with Tennessee Code Annotated Section 47-2-510 is *Moses v. Newman*, 658 S.W.2d 119 (Tenn. Ct. App. 1983). In *Moses*, the plaintiff purchased a mobile home. The contract between the parties required the seller to set up the mobile home on plaintiff's site. *Id*. at 119. The mobile home was delivered to the site, but prior to being set up, it was destroyed by a wind storm. *Id*. The question of whether the purchaser had accepted the mobile home was disputed. In reviewing the case, this Court affirmed the trial court's factual determination that the mobile home had failed to conform with the contract as it had not been set up as contemplated under the contract, and thus the plaintiff had a right of rejection. Specifically, this Court held that the "right of rejection under T.C.A. §47-2-601 arises if the goods fail in any respect to conform to the contract." *Id.* at 122. Because the mobile home did not conform to the contract under Tennessee Code Annotated Section 47-2-106(2) ("Goods or conduct including any part of a performance are "conforming" or conform to the contract when they are in accordance with the obligations under the contract."), we concluded that the risk of loss had not shifted to the buyer:

> For the risk to shift to the purchaser, the purchaser must receive the goods and the seller must fulfill his contractual obligations. "Under subsection (1) the seller by his individual action cannot

shift the risk of loss to the buyer unless his action conforms with all the conditions resting on him under the contract." Comment 1 to T.C.A., § 47-2-510. *See **William F. Wilke, Inc. v. Cummins Diesel Engines, Inc.***, 252 Md. 611, 250 A.2d 886 (1969), where the court held, **notwithstanding the fact that the goods were delivered to the buyer, the risk of loss remained with the seller where the seller had not conducted testing or the inspection specified by the contract of sale**.

*Id*. at 122 (emphasis added).

As noted above, it is undisputed that the boards at issue here did not conform to Ms. Merola's representation that they had been tested and were in good condition. Rather, Mr. Huddleston discovered that the boards had been repaired with "jumper repairs," and that at least one of the boards did not have a serial number. It is undisputed that Mr. Huddleston was unable to sell the product to his customer. From the record, we cannot conclude that the boards conformed to the agreement between the parties. Accordingly, Section 47-2-510(1) is applicable. Based upon the facts of this case, we cannot conclude that the evidence preponderates against either the trial court's determination that the UCC applies to this transaction, or to its determination that the risk of loss remained with Ms. Merola.

### Insurance

On December 29, 2008, Mr. Huddleston sent an email to Ms. Merola, stating that he had used Federal Express for years and had never had any package lost so "I never bother insuring them." Mr. Huddleston further indicated that, per her email instructions for the return, Ms. Merola "didn't tell [3L] to insure [the return] as it was sent on your account and insurance would have added quite a bit to the cost." Because Mr. Huddleston did not have authorization to charge Ms. Merola's account with extra costs, and had not been instructed to have the return package insured, he did not do so. Ms. Merola responded via email, that "we have regular drivers and they know to come through the side into the building . . . so nothing is ever left anywhere here. . . . [Federal Express] say[s] there was NO insurance on the package—which is very odd for a $35,000 order???"

By email of January 15, 2009, Ms. Merola stated that "there has been a claim filed with FEDEX and the insurance company instructed us to get back in touch with them once FEDEX has completed the claim. We have no obligation to file with our insurance company on this."

During her cross-examination of Mr. Huddleston at the hearing, Ms. Merola asked

why he did not insure the returned package. Mr. Huddleston reiterated that he had never had a problem with lost packages in the fifteen years that he had used Federal Express, and that he did not have her authorization to charge her account for insurance. Ms. Merola then asked:

> Q. And Mr. Huddleston, do you remember I filed a claim on your behalf with FedEx, and that because you hadn't insured the package, that they could only offer their minimum, plus the shipping cost?

3L's attorney objected to this question, arguing:

> Whether or not she filed a claim, at the end of the day, Your Honor, this is simply governed by the UCC, and we've got rejected goods. And rejected goods, under the UCC, the risk of loss is with the seller the whole time. They're rejected. They don't conform to the contract. The seller always has the risk of loss.

The trial court sustained the objection. This was proper according to Comment 3 to Tennessee Code Annotated Section 47-2-510, which provides:

> In cases where there has been a breach of the contract, if the one in control of the goods is the aggrieved party, whatever loss or damage may prove to be uncovered by his insurance falls upon the contract breaker under subsections (2) and (3) rather than upon him. The word "effective" as applied to insurance coverage in those subsections is used to meet the case of supervening insolvency of the insurer. The "deficiency" referred to in the text means such deficiency in the insurance coverage as exists without subrogation. This section merely distributes the risk of loss as stated and is not intended to be disturbed by any subrogation of an insurer.

Accordingly, the question of whether the returned package was insured is not dispositive of the question of which party bears the risk of the loss. In the instant case, the fact that there was no insurance does not relieve Ms. Merola of the risk of loss, which remained with her due to the fact that the goods she sold to 3L did not conform with her statement that the boards were in good condition. Consequently, the transaction between these two merchants required the seller, Ms. Merola, to fulfill her contractual obligations, including providing

conforming goods. That was not done in this case as the boards were unusable. 3L exercised its right as a buyer to reject the goods under Tennessee Code Annotated Section 47-2-601(a), and the risk of loss remained with the seller, Ms. Merola, under Tennessee Code Annotated Section 47-2-510(1).

### *Pro Se* Litigant

On appeal, Ms. Merola argues that she received unfair treatment as a *pro se* litigant. It is well settled that *pro se* litigants are held to the same procedural and substantive standards to which lawyers must adhere. As explained by this Court:

> Parties who decide to represent themselves are entitled to fair and equal treatment by the courts. The courts should take into account that many *pro se* litigants have no legal training and little familiarity with the judicial system. However, the courts must also be mindful of the boundary between fairness to a *pro se* litigant and unfairness to the *pro se* litigant's adversary. Thus, the courts must not excuse *pro se* litigants from complying with the same substantive and procedural rules that represented parties are expected to observe.

*Jackson v. Lanphere*, No. M2010-01401-COA-R3-CV, 2011 WL 3566978, at *3 (Tenn. Ct. App. Aug.12, 2011) (quoting *Hessmer v. Hessmer*, 138 S.W.3d 901, 903 (Tenn. Ct. App. 2003)). In the first instance, Ms. Merola is not entitled to any special treatment due to her status as a self represented litigant. Rather, she is entitled to the same treatment as any represented litigant would receive.

Here, the substance of Ms. Merola's unfair treatment argument rests upon the fact that the trial court did not inquire of Ms. Merola whether there was insurance that might cover the shipment of the boards. Ms. Merola argues that, in failing to ask about insurance, the trial court deprived her of the opportunity to present evidence on the subject, which could have changed the result in the case. We respectfully disagree.

We are not aware of any caselaw, nor has Ms. Merola provided this Court with any citation, which places a duty on a trial court to inquire about any theory of liability, defense, or evidence in a civil matter. It is axiomatic that, in the adversarial process of trial, a party must pursue his or her theory of the case and must build a record to support that theory. Accordingly, it was not incumbent upon the trial court to try the issue of insurance in this case; if Ms. Merola believed this to be an issue, it was incumbent upon her to present it for the trial court's consideration. Nonetheless, we have reviewed the transcript of the hearing

and cannot conclude that the trial court erroneously limited Ms. Merola's ability to pursue the question of insurance. Although the trial court sustained 3L's objection to the insurance question, *supra*, that ruling was correct. As discussed above, the existence of insurance does not bear upon the question of which party has the risk of loss in this case. Accordingly, even if Ms. Merola had developed her record on the subject of insurance, this would not have had an impact on the substantive issue presented in this case.

## Prejudgment Interest

As noted above, the trial court awarded 3L prejudgment interest at a rate of six percent. Tennessee Code Annotated Section 47-14-123 provides, in relevant part:

> Prejudgment interest, i.e., interest as an element of, or in the nature of, damages, as permitted by the statutory and common laws of the state as of April 1, 1979, may be awarded by courts or juries in accordance with the principles of equity at any rate not in excess of a maximum effective rate of ten percent (10%) per annum.

The trial court's award of damages and award of prejudgment interest is reviewed under an abuse of discretion standard. *BankcorpSouth Bank, Inc. v. Hatchel*, 223 S.W.3d 223, 230 (Tenn. Ct. App.2006); *Franklin Capital Assocs., L.P. v. Almost Family, Inc.*, 194 S.W.3d 392, 405 (Tenn. Ct. App. 2005). A trial court abuses its discretion only when it applies an incorrect legal standard or reaches a decision which is against logic or reasoning that causes an injustice to the party complaining. *Eldridge v. Eldridge*, 42 S.W.3d 82, 85 (Tenn.2001) (quoting *State v. Shirley*, 6 S.W.3d 243, 247 (Tenn.1999)). If a discretionary decision is within a range of acceptable alternatives, we will not substitute our judgment for that of the trial court simply because we may have chosen a different alternative. *White v. Vanderbilt Univ.*, 21 S.W.3d 215, 223 (Tenn. Ct. App.1999).

Although discretionary in nature, this Court has previously discussed the rationale for an award of prejudgment interest:

> Parties who have been wrongfully deprived of money have been damaged in two ways. First, they have been damaged because they have not received the money to which they are entitled. Second, they have been damaged because they have been deprived of the use of that money from the time they should have received it until the date of judgment. Awards of pre-judgment interest are intended to address the second type of

-12-

damage. They are based on the recognition that a party is damaged by being forced to forego the use of its money over time. Thus, our courts have repeatedly recognized that prejudgment interest is awarded, not to punish the wrong-doer, but to compensate the wronged party for the loss of the use of the money it should have received earlier.

*Scholz v. S.B. International, Inc.*, 40 S.W.3d 78, 82 (Tenn. Ct. App. 2000) (internal citations omitted). "Fairness will, in almost all cases, require that a successful plaintiff be fully compensated by the defendant for all losses caused by the defendant, including the loss of use of money the plaintiff should have received." *Id*. at 83 (internal citations omitted).

Having determined above that the risk of loss remained with Ms. Merola at all relevant times, we can only conclude that 3L was deprived of the use of the $35,090.60 that it paid for the defective boards. This is an argument that 3L pursued throughout these proceedings, arguing on several occasions that the loss of the use of the $35,090.60 hindered its ability to purchase boards to replace the defective boards, and thus hindered its ability to service its customer. Based upon the record in this case, we cannot conclude that the award of prejudgment interest at a rate of six percent was an abuse of the trial court's discretion.

## Attorney Fees

As noted above, the trial court awarded 3L $6,819.17 in attorney fees. Here, Ms. Merola argues that the award of attorney fees was erroneous because the trial court specifically found that there was no violation of the Tennessee Consumer Protection Act.

The allowance of attorney's fees is largely in the discretion of the trial court, and the appellate court will not interfere except upon a clear showing of abuse of that discretion." *Taylor v. Fezell*, 158 S.W.3d 352, 359 (Tenn. 2005) (quoting *Aaron v. Aaron*, 909 S.W.2d 408, 411 (Tenn.1995)). However, Tennessee, like most jurisdictions, adheres to the "American Rule," which provides that "litigants pay their own attorney's fees absent a statute or an agreement providing otherwise." *State v. Brown & Williamson Tobacco Corp*., 18 S.W.3d 186, 194 (Tenn. 2000); *accord Taylor v. Fezell*, 158 S.W.3d 352, 359 (Tenn. 2005). "Under the American [R]ule, a party in a civil action may recover attorney fees only if: (1) a contractual or statutory provision creates a right to recover attorney fees; or (2) some other recognized exception to the American [R]ule applies, allowing for recovery of such fees in a particular case." *Cracker Barrel Old Country Store, Inc. v. Epperson*, 284 S.W.3d 303, 308 (Tenn. 2009) (citing *Taylor v. Fezell*, 158 S.W.3d at 359; *John Kohl & Co. v. Dearborn & Ewing*, 977 S.W.2d 528, 534 (Tenn.1998)). "[A]s a general principle, the American [R]ule reflects the idea that public policy is best served by litigants bearing their own legal fees

regardless of the outcome of the case." ***House v. Estate of Edmondson***, 245 S.W.3d 372, 377 (Tenn.2008).

As a general rule, attorney's fees are not recoverable in a suit between parties to a contract to simply enforce the contract terms, unless the contract expressly allows for such recovery. *See **Holcomb v. Cagle***, 277 S.W.3d 393 (Tenn. Ct. App.2008) (holding that the contractual language to hold plaintiffs harmless from "any cost, loss, damage, or expense arising solely out of any failure of the Tenant to comply with any of the requirements or provisions of th[e] Ground Lease" did not explicitly provide for the recovery of attorney fees incurred in enforcing its provisions). In the instant case, the record contains no evidence of either a written, or oral contract evincing either party's right to recover attorney fees.

In its brief, 3L asserts that the trial court's award of attorney fees was based on the Tennessee Consumer Protection Act. The Tennessee Consumer Protection Act provides that, "Upon a finding by the court that a provision of this part has been violated, the court may award to the person bringing such action reasonable attorney's fees and costs." Tenn. Code Ann. § 47-18-109(e)(1). In its statements from the bench, however, the trial court specifically stated: "I don't find that there's proof sufficient for the Court to determine that Ms. Merola committed fraud or that she's violated the Consumer Protection Act." Accordingly, the court "decline[d] to find that [Ms. Merola is] responsible for punitive damages or treble damages under the Consumer Protection Act." It is well settled that a court speaks through its orders. ***Palmer v. Palmer***, 562 S.W.2d 833, 837 (Tenn. Ct. App.1977). Neither party has specifically appealed the trial court's determination that Ms. Merola did not violate the Tennessee Consumer Protection Act. Therefore, Tennessee Code Annotated Section 47-18-109(e)(1) is not applicable as the basis for an award of attorney fees in this case.

Other than its Tennessee Consumer Protection Act argument, 3L asserts no other basis for the trial court's award of attorney fees, nor is the basis for the award apparent from the trial court's order. Here, as set out in full context above, the trial court's order states only that "Plaintiff is entitled to an award of attorney fees in bringing this action." The court, however, does not state its ground for this finding. Because Tennessee follows the American Rule with regard to attorney fees, unless the trial court provides the statute or agreement under which an award of attorney fees is allowed, the litigants are required to pay their own attorney's fees. ***State ex rel. v. Thomas***, 585 S.W.2d 606, 607 (Tenn.1979) (holding that the rule in Tennessee is well-established that no party is entitled to award of attorney fees in absence of statute, contract, or recognized ground of equity so providing). In the absence of a specific basis for deviating from the American Rule, an award of attorney fees was improper in this case.

For the foregoing reasons, we reverse the award of attorney fees in this case. The

judgment is otherwise affirmed and the case is remanded for such further proceedings as may be necessary and are consistent with this Opinion. Costs of this appeal are taxed one-half to Appellant, Jodi Merola, individually and d/b/a NY Telecom Supply and NY Telecom and Network Supply, L.L.C., and her surety, and one-half to Appellee, 3L Communications, L.L.C., for all of which execution may issue if necessary.

_____
J. STEVEN STAFFORD, JUDGE